767 F.2d 1514
 38 Fair Empl.Prac.Cas. 1094,
37 Empl. Prac. Dec. P 35,484
Phillip PARADISE, Jr., et al., Plaintiffs-Appellees,
United States of America, Plaintiff-Amicus Curiae-Appellee,
Cross-Appellant,
v.
Byron PRESCOTT, as Director of the Alabama Department of
Public Safety, Defendant-Appellant, Cross-Appellee,
V.E. McClellan, et al., Defendants-Intervenors,
Appellants-Cross-Appellees.
 Nos. 84-7053, 84-7564.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 12, 1985.
 
 Edward L. Hardin, Jr., Sp. Asst. Atty. Gen., Theresa Jo. Hanson, Birmingham, Ala., for Alabama Dept. of Public Safety.
 James S. Ward, Birmingham, Ala., for V.E. McClellan, et al.
 Louise A. Lerner, William Bradford Reynolds, Walter W. Barnett, Civil Rights Div., Washington, D.C., for U.S. Dept. of Justice.
 John C. Bell, U.S. Atty., Kenneth E. Vines, Asst. U.S. Atty., Montgomery, Ala., Charles J. Cooper, Deputy Asst. Atty. Gen., Alexandria, Va., for amicus curiae U.S.
 Dennis N. Balske, Deborah A. Ellis, Montgomery, Ala., for Phillip Paradise, et al.
 Daniel J. Leffell, Robert D. Joffe, New York City, for amici curiae Lawyer's Committee for Civil Rights under Law and NAACP Legal Defense and Educational Fund, Inc.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before FAY and ANDERSON, Circuit Judges, and GIBSON*, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 In 1972, then Chief District Judge Frank M. Johnson, Jr., found that the Alabama Department of Public Safety (the Department) "engaged in a blatant and continuous pattern and practice of" discriminating against blacks in hiring. NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala.1972), aff'd, 493 F.2d 614 (5th Cir.1974). Thirteen years later, the unfortunate effects of that unconstitutional discrimination still persist. These consolidated appeals involve the district court's latest attempts to integrate the Alabama state trooper force.
 
 
 2
 In case number 84-7053 (Paradise I) all parties, save the plaintiffs, appeal the December 15, 1983 order of Judge Thompson[1] enjoining the Department to promote one black trooper for each white trooper promoted to a higher rank until either 25% of the rank is comprised of black troopers or the defendants have in place a promotion plan for the rank conforming to the law and to all prior court orders and consent decrees. As a result of that order, the Department developed and implemented a plan for promotions to the rank of corporal. The court thereafter suspended operation of the December 15 order to such corporal promotions and instead allowed the Department to use its long-awaited promotional plan for that rank. Only the intervenors, in case number 84-7564 (Paradise II), appeal this order. Having carefully reviewed the record and the numerous briefs submitted by the parties and amicus curiae, we affirm the district court in both cases.
 
 I. PROCEDURAL HISTORY
 
 3
 (a) NAACP v. Allen: "blatant and continuous ... discrimination in hiring".
 
 
 4
 In January, 1972, the NAACP brought a class action suit against the Department and the Alabama Personnel Department, alleging violations of the fourteenth amendment and 42 U.S.C. Secs. 1981 and 1983. The NAACP contended that the Department "systematically exclud[ed] Negroes from its employees," R.E. at 39, and that because the Department had "not abandoned its racially discriminatory hiring practices ... the constitutional rights of the Plaintiff, its members, and the class" were abridged. Id. at 41. Thereafter, the United States was made a party plaintiff, and the motion by Phillip Paradise, Jr., to intervene as a party plaintiff, individually and on behalf of the similarly situated class, was granted.
 
 
 5
 After a hearing was held, the district court concluded:
 
 
 6
 Plaintiffs have shown without contradiction that the defendants have engaged in a blatant and continuous pattern and practice of discrimination in hiring in the Alabama Department of Public Safety, both as to [state highway patrol] troopers and supporting personnel. In the thirty-seven-year history of the patrol there has never been a black trooper and the only Negroes ever employed by the department have been nonmerit system laborers. This unexplained and unexplainable discriminatory conduct by state officials is unquestionably a violation of the Fourteenth Amendment. (citations omitted).
 
 
 7
 Under such circumstances ... the courts have the authority and the duty not only to order an end to discriminatory practices, but also to correct and eliminate the present effects of past discrimination. (citations omitted). The racial discrimination in this instance has so permeated the [Department's] employment policies that both mandatory and prohibitory injunctive relief are necessary to end these discriminatory practices and to make some substantial progress toward eliminating their effects.
 
 
 8
 NAACP v. Allen, 340 F.Supp. at 705 (emphasis added).
 
 
 9
 The district court entered a comprehensive injunctive order (1972 Order). The court enjoined the defendants from engaging in any employment practices--including promotion--for the purpose or with the effect of discriminating against any employee or applicant for employment on the basis of race. Id. at 706. The court, inter alia, also ordered the defendants to hire one black trooper for each white trooper hired until the state trooper force was comprised of approximately 25% blacks.[2] Id.
 
 
 10
 On appeal to the former Fifth Circuit, the defendants did not challenge the finding of "blatant and continuous" discrimination in hiring; rather, they contended that the quota hiring relief ordered by the district court unconstitutionally discriminated against eligible white applicants and improperly forced the Department to pass over whites who had fared better in the testing process in favor of less qualified blacks. NAACP v. Allen, 493 F.2d 614, 617 (5th Cir.1974).[3] The Fifth Circuit disagreed.
 
 
 11
 The court first addressed the constitutional issues raised by affirmative hiring relief. The court held that white applicants who had higher eligibility rankings than blacks were not denied equal protection or due process rights because unvalidated selection procedures which disproportionately exclude blacks "have not been shown to be predictive of successful job performance." Id. at 620. Absent validated selection procedures, the court reasoned, "it is illogical to argue that quota hiring produces unconstitutional 'reverse' discrimination, or a lowering of employment standards, or the appointment of less or unqualified persons." Id. The court further held that temporary affirmative hiring relief which resorted to racial criteria, if it were the only rational, nonarbitrary means of eradicating the present effects of past discrimination, denied no one their constitutional rights and was justified by the governmental and social interest in effectively ending unconstitutional discrimination. Id. at 619.
 
 
 12
 Having rejected the defendants' constitutional arguments, the court next proceeded to determine whether the district court abused its discretion in ordering quota hiring. Id. at 620. The court recognized that the district court was faced with "(1) clear evidence of a long history of intentional racial discrimination, (2) a paucity, if not a total absence of any positive efforts by the [Department] to recruit minority personnel, and (3) utilization of unvalidated employment criteria and selection procedures and other discriminatory practices." Id. Because the fourteenth amendment violation was "so clearly demonstrated," the district court was obliged "to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Id. at 617 (quoting Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965)). The court accordingly upheld the district court's conclusion that quota hiring relief "was essential to make meaningful progress towards eliminating the unconstitutional practices and to overcome the patrol's thirty-seven year reputation as an all-white organization." 493 F.2d at 620-21.[4]
 
 
 13
 (b) 1975 Order: The defendants purposefully frustrate or delay full relief to the plaintiff class.
 
 
 14
 The plaintiffs, in 1974, moved the district court for further relief. The hearing which was held on that motion focused on two issues: (1) whether the defendants had artificially restricted the size of the trooper force to frustrate the 1972 hiring order; and (2) the disproportionate failure of blacks hired under that order to achieve permanent trooper status. Record, Vol. 1, at 41.
 
 
 15
 The district court found that at the time it entered the 1972 Order, and at all material times thereafter, the responsible state officials recognized that there was a "critical shortage of troopers" in Alabama. Id. at 42. The court further found that since the 1972 Order, the Department hired fewer troopers than was necessary to offset even normal attrition. Id. Additionally, examination of the Department's pre- and post-1972 Order fund allocation and expenditure patterns revealed that the Department had either not spent or had diverted to other uses funds which could have been used for salaries and ancillary expenses for new troopers. Id. at 42-43. The court concluded:These findings, when combined with the considerable testimony regarding the defendants' reluctance to implement the court's remedial order by placing black troopers on the state's highways, necessitate the conclusion that the defendants have, for the purpose of frustrating or delaying full relief to the plaintiff class, artificially restricted the size of the trooper force and the number of new troopers hired.
 
 
 16
 Id. at 43.
 
 
 17
 The district court further found that the comparatively high black attrition rate (of the 40 blacks hired since the 1972 Order only 27 were still on the force, while all 29 whites hired in that period remained) was not coincidental. Indeed, the court found that the high attrition rate among blacks resulted from: (1) failure to select the best qualified blacks from the eligibility rosters; (2) official and social discrimination against blacks at the trooper training academy; (3) preferential treatment of white new-hires in training and testing; and (3) harsher discipline for blacks than whites for similar misconduct while on the force. Id. at 44. Based on these findings, the court enjoined the defendants from artificially restricting the size of the troopers force for the purpose or with the effect of delaying or frustrating achievement of the goal of having blacks comprise 25% of the trooper force (1975 Order). Id.
 
 
 18
 (c) The 1979 Partial Consent Decree: The defendants obligate themselves to develop a promotion procedure within one year that will have little or no adverse impact on blacks.
 
 
 19
 In September of 1977, plaintiffs moved the district court for supplemental relief. After extensive discovery, a Partial Consent Decree (1979 Decree) resolving most of the disagreements between the parties was agreed to by all concerned and approved by the court on February 16, 1979. Record, Vol. 1, at 50-57.
 
 
 20
 In the 1979 Decree, the parties explicitly recognized the continuing effect of the district court's 1972 and 1975 Orders. Id. at 50. The defendants also agreed not to engage in any act or practice which had the purpose or effect of unlawfully discriminating against blacks. Id. at 50-51. With respect to promotions, the defendants agreed to develop a promotion procedure which would be fair to all applicants and have "little or no adverse impact on blacks seeking promotion to corporal." Id. at 53.[5] The defendants obligated themselves to accomplish this within one year from the signing of the 1979 Decree.[6] Id. Once the procedure for promotion to corporal had been validated, the defendants were to begin validation of promotion procedures for the positions of sergeant, lieutenant, captain, and major, in turn. Id. The defendants further agreed to allow plaintiffs to apply to the court for an order enforcing the terms of the 1979 Decree, or to "apply for any other relief which may be appropriate." Id. at 51.
 
 
 21
 (d) Paradise v. Shoemaker: The 1972 Order means what it says and will not be modified.
 
 
 22
 Five days after the district court approved the 1979 Decree, the defendants filed a motion to more fully define the quota relief set forth in the 1972 Order, or, in the alternative, for supplemental relief. Interpreting the motion as one seeking "clarification" of the 1972 Order, the district court gave short shrift to the defendants' argument that "state trooper" referred only to arresting officers holding entry-level positions. See Paradise v. Shoemaker, 470 F.Supp. 439, 440 & n. 1 (M.D.Ala.1979). "On this point, there is no ambiguity. The Court's [1972] order required that one-to-one hiring be carried out until approximately twenty-five percent of the state trooper force is black." Id. at 440 (emphasis in original).
 
 
 23
 The district court likewise had little difficulty disposing of the defendants' alternative claim that they were entitled to supplemental relief in the form of modification of the 1972 Order.[7] The defendants argued that the affirmative hiring relief ordered by the court exceeded what was necessary to eliminate the effects of past discrimination in that the Department's promotion policy required advancement through the ranks and prohibited lateral hiring. Because, according to the defendants, the 25% objective could not be achieved unless 37.5% of entry-level positions were filled by blacks, a greater number of "more qualified white applicants" were excluded than was constitutionally permissible. Id. at 441.
 
 
 24
 The district court, relying on the Fifth Circuit's affirmance of the 1972 Order in NAACP v. Allen, 493 F.2d 614, held that modification was precluded by the law of the case doctrine. Paradise v. Shoemaker, 470 F.Supp. at 441. Even if the doctrine were not apposite, however, the district court discerned no constitutional reason for disturbing its prior order. Id. at 441-42. The court concluded:
 
 
 25
 To modify this order would be to do less than the law requires, which is to eradicate the continuing effects of past unlawful practices. In 1972, defendants were not just found guilty of discriminating against blacks in hiring to entry-level positions. The Court found that in thirty-seven years there had never been a black trooper at any rank. One continuing effect of that discrimination is that, as of November 1, 1978, out of 232 state troopers at the rank of corporal or above, there is still not one black. The quota fashioned by the Court provides an impetus to promote blacks into those positions. To focus only on the entry-level positions would be to ignore that past discrimination by the Department was pervasive, that its effects persist, and that they are manifest. As the Fifth Circuit has recognized, the order in this case does not seek to grant proportional representation in public employment to the black citizens of Alabama. NAACP v. Allen, 493 F.2d at 621. The order in this case is but the necessary remedy for an intolerable wrong. Accordingly, the motion for supplemental relief will be denied.
 
 
 26
 Id. at 442 (emphasis in original).
 
 
 27
 (e) The 1981 Consent Decree.
 
 
 28
 More than two years after the 1979 decree was entered, the defendants, on April 13, 1981, moved the district court for approval of a new examination to be used for promotions to the corporal rank. Record, Vol. 1, at 66. After reviewing the proposed promotion procedure,[8] the plaintiffs and the United States filed a joint response objecting to approval of the proposed examination and promotional procedure. Id. at 83-97. They essentially maintained that the examination had not been validated in accordance with the Uniform Guidelines, see supra note 5, and that its use would not be justified if the results showed an adverse impact on blacks. A hearing was never held on the defendants' motion, however, because the parties executed another consent decree (1981 Decree), which was endorsed by the district court on August 18, 1981. Record, Vol. 1, at 101.
 
 
 29
 In the 1981 Decree, the defendants acknowledged their obligation under the 1979 Decree to utilize a promotion procedure having little or no adverse impact on blacks. To avoid unnecessary litigation, and to expeditiously establish a selection procedure for corporals, the parties agreed that defendants' proposed promotion procedure would be administered and scored. Thereafter, the promotion register would be "reviewed to determine whether the promotion procedure has an adverse impact against black applicants." Id. at 103. This determination was to be made by reference to the "four fifths" rule[9] set forth in Section 4D of the Uniform Guidelines. Id. at 103-04; see 28 C.F.R. Sec. 50.14. If the procedure had little or no adverse impact on blacks, selections were to be made in rank order from the promotion register. Record, Vol. 1, at 104. If the parties were unable to agree whether the procedure had an adverse impact, the matter was to be submitted to the district court for resolution. Id. at 104. No promotions to the corporal rank were to be made pending resolution of the adverse impact issue. Id. If the parties agreed, or the court found, that the procedure did have an adverse impact on blacks, promotions were to be made "in a manner that does not result in adverse impact for the initial group of promotions or cumulatively during use of the procedure." Id. The defendants were to submit an alternative proposed promotion procedure, and if the parties failed to agree on the method for making promotions, then the matter was to be submitted to the court for resolution. Id. No promotions to corporal were to be made unless the parties agreed on, or the court ruled upon, the method to be used for making promotions with little or no adverse impact. Id. at 104. In the event that the promotion procedure was deemed to have an adverse impact on blacks, the defendants agreed to examine the results to identify the sources of that impact and to revise the promotion procedure so as to avoid the problem in the future. Id. at 105. The defendants also agreed to give the plaintiffs data showing the impact of each component of the promotion procedure, as well as an item-by-item analysis of the impact of the written examination. Id. The parties were then to attempt to agree upon modifications in the promotion procedures for future administrations. Id. Again, if the parties were unable to resolve their differences, the matter was to be submitted to the district court for resolution. Id.
 
 
 30
 In accordance with the 1981 Decree, the defendants administered their written examination on October 24, 1981. The resulting promotion register indicates that of the 262 applicants for promotion to corporal, 60 (22.9%) were black. Of the 60 blacks who took the test, only 5 (8.3%) were ranked among the top half of the candidates, and of these, the highest ranked was # 80. Id. at 117-28. On June 21, 1982, the defendants, responding to an inquiry from the United States, stated that there was an immediate need for 8-10 promotions to corporal, and that 16-20 promotions would ultimately be made from the promotion list before the construction of a new list. Id. Vol. 2, at 222. The United States, by letter, objected to rank-order use of the promotion procedure, contending that, in its view, such use would result in substantial adverse impact on black applicants for promotion to corporal. Id. at 220-21. The United States suggested that the defendants abide by the terms of the 1981 Decree and formulate a "proposal for making promotions in a manner that does not result in discriminatory impact on black troopers." Id. at 220.
 
 
 31
 (f) The Instant Proceedings.
 
 
 32
 Plaintiffs, on April 7, 1983, moved the district court for an order enforcing the terms of the 1979 and 1981 Decrees. Plaintiffs sought an order requiring the defendants to promote blacks to the corporal rank "at the same rate at which they have been hired, 1 for 1, until such time as the defendants implement a valid promotional procedure." Record, Vol. 1, at 112. According to plaintiffs, such an order was justified by the terms of the decrees, would "encourage defendants to develop a valid promotional procedure as soon as possible," and would "help alleviate the gross underrepresentation of blacks in the supervisory ranks of the Department." Id. Plaintiffs principally relied on the results of the October, 1981, corporal examination and the fact that since the 1979 Decree had been entered, no valid promotional mechanism had been developed. Indeed, the only blacks promoted since 1972 were the four promoted pursuant to the 1979 Decree. Thus, even though blacks had been employed in the Department for 11 years, only four had advanced beyond the lowest rank.
 
 
 33
 The United States opposed imposition of a 1-for-1 promotional quota, contending that such relief was inconsistent with the 1981 Decree, went beyond the district court's remedial authority under Title VII, and was unconstitutional. Record, Vol. 2, at 195-202. The United States agreed, however, that the decrees should be enforced by ordering some promotions, unless the defendants could show cause why such promotions should not be made.[10]
 
 
 34
 The defendants agreed with the United States that the relief sought by the plaintiffs in their motion to enforce was unconstitutional. The defendants also argued, however, that they should be given an opportunity to demonstrate that the proposed promotion procedure was valid and did not adversely impact on blacks, within the meaning of the consent decrees and the Uniform Guidelines.
 
 
 35
 Shortly after the motion to enforce was filed, four white applicants for promotion to corporal moved to intervene on behalf of a class composed of those white applicants who took the corporal's promotion examination and ranked # 1 through # 79. Record, Vol. 1, at 130-35. The intervenors, inter alia, contended that the 1979 and 1981 Decrees, as well as the relief sought by the plaintiffs in their motion to enforce, were unconstitutional, unreasonable, illegal, and against public policy. Id. at 131-134.
 
 
 36
 The district court, on May 27, 1983, held a hearing on both the motion to enforce and the motion to intervene. In an order filed October 28, 1983, the district court allowed the intervenors to participate in the case on a prospective basis only; the court held that as to prior orders, judgments, and decrees, intervention was untimely. Record, Vol. 2, at 309-10. By separate order, also filed on October 28, the district court determined that, when judged against the 1979 and 1981 Decrees, the defendants' selection procedure adversely impacted on blacks. Paradise v. Prescott, 580 F.Supp. 171 (M.D.Ala.1983). The court noted that even if 79 corporals were promoted in rank order, rather than just the 15 the defendants stated were needed as soon as possible, none would be black. Id. at 173. "Short of outright exclusion based on race, it is hard to conceive of a selection procedure which would have a greater discriminatory impact." Id.[11]
 
 
 37
 Having held that the promotion procedure adversely impacted on blacks, the district court, pursuant to the 1981 Decree, enjoined the defendants from using that procedure for promotion purposes. Id. at 174-175. The court also ordered the defendants to submit a plan to promote to corporal, from qualified candidates, at least 15 persons in a manner that would not have an adverse racial impact. Id. at 175. The court indicated that if the parties to the 1981 Decree were unable to agree on a promotion plan, "the issue of corporal promotions shall be deemed submitted for resolution by the court." Id.
 
 
 38
 On November 10, 1983, the Department submitted to the district court its proposed promotion procedure. Record, Vol. 2, at 356. The Department proposed to promote 15 troopers to the position of corporal, of whom 4 would be blacks. It urged that this procedure, to be used on a one-time basis only, reflected the percentage of blacks to whites who took the corporal examination, and met the requirements of the four-fifths rule of the Uniform Guidelines. The Department also requested an order permitting the Department of Personnel a specified period of time within which to develop and submit for prior court approval a non-discriminatory corporal promotion procedure for use in subsequent promotions.
 
 
 39
 The plaintiffs vigorously opposed the Department's proposal. Id. at 382-89. They contended that the proposal "totally disregards the injury plaintiffs have suffered due to the defendants' four-and-a-half year delay [a reference to the 1979 Decree] and fails to provide any mechanism that will insure the present scenario will not reoccur." Id. at 382. Plaintiffs reasoned that because of the defendants' conduct, blacks were clustered at the lowest level of employment with no proper procedure for promotion to corporal in place, while the Department continued to promote whites from all-white rosters to the positions of sergeant, lieutenant, captain, and major. Id. at 382-83. Approval of the Department's procedure, the plaintiffs argued, would place the judicial imprimatur on the defendants' obdurate conduct. Plaintiffs reiterated their request for a 1-for-1 promotion requirement until a valid promotion procedure is in place. Such relief would give the defendants "an incentive to carry out their almost five-year-old obligation," id. at 385, and would "make up for the additional injury they have thrust upon plaintiffs for their noncompliance [with the 1979 and 1981 Decrees]." Id. at 384.
 
 
 40
 The United States did not oppose the Department's proposal to promote 11 whites and 4 blacks to corporal; it did, however, oppose the entry of an order which would sanction court approval of a promotion plan prior to its actual implementation. Such an order, according to the United States, would circumvent the 1981 Decree's requirement that a selection procedure be actually administered to determine if it adversely impacted on blacks. Id. at 423-26.
 
 
 41
 The intervenors opposed approval of any promotion plan which imposed a promotion quota. They submitted that corporal promotions should be by rank-order use of the promotion register resulting from the 1981 corporal promotional examination. Id. at 448.
 
 
 42
 On December 15, 1983, the district court granted the plaintiffs' motion to enforce the 1979 and 1981 Decrees. Paradise v. Prescott, 585 F.Supp. 72 (M.D.Ala.1983). Faced with the Department's immediate need to promote 15 new corporals, and the fact that the parties were unable to agree on a promotion procedure, the court, "in accordance with" the 1979 and 1981 Decrees, id. at 73, undertook to "fashion a [promotion] procedure." Id. at 74.
 
 
 43
 The court aptly summarized the situation as follows:
 
 
 44
 On February 10, 1984, less than two months from today, twelve years will have passed since this court condemned the racially discriminatory policies and practices of the Alabama Department of Public Safety. Nevertheless, the effects of these policies and practices remain pervasive and conspicuous at all ranks above the entry-level position. Of the 6 majors, there is still not one black. Of the 25 captains, there is still not one black. Of the 35 lieutenants, there is still not one black. Of the 65 sergeants, there is still not one black. And of the 66 corporals, only four are black. Thus, the department still operates an upper rank structure in which almost every trooper obtained his position through procedures that totally excluded black persons. Moreover, the department is still without acceptable procedures for advancement of black troopers into this structure, and it does not appear that any procedures will be in place within the near future. The preceding scenario is intolerable and must not continue. The time has now arrived for the department to take affirmative and substantial steps to open the upper ranks to black troopers.
 
 
 45
 Id. (emphasis in original). The court agreed with plaintiffs that, temporarily at least, 50% of all promotions to corporal and to higher ranks must be filled by qualified black troopers. Id. at 75. The court also shared the plaintiffs' concern over the Department's delay in developing acceptable promotion procedures for all ranks. Id. The court therefore ordered the Department to promote one black trooper for each white trooper promoted to a higher rank, if there is a black trooper objectively qualified to be promoted to the rank, until either (1) approximately 25% of the rank is comprised of black troopers, or (2) the defendants have developed and implemented a promotion plan for the rank conforming with the prior orders and decrees in the case and all other legal requirements. Record, Vol. 2 at 482-83; see Paradise v. Prescott, 585 F.Supp. at 75. The court also ordered the defendants to submit for the court's approval a schedule for the development of promotion procedures for all ranks above the entry-level position. Record, Vol. 2 at 483.
 
 
 46
 The order was premised on the court's belief that the effects of past discrimination "will not wither away of their own accord." Paradise v. Prescott, 585 F.Supp. at 75. Quota relief was appropriate, the court reasoned, because such relief was necessary and reasonable. The relief was necessary because the history of this case made it clear that the "intolerable" and "egregious" racial disparities in the upper ranks of the Department would not be eradicated absent "immediate, affirmative, race-conscious action." Id. The quota relief was reasonable because: (1) it was a temporary measure; (2) it did not require the discharge, demotion, or replacement of any white troopers; (3) it did not require the promotion of any unqualified black trooper; (4) it did not unnecessarily trammel the interests of white troopers; and (5) it was specifically tailored to redress the present effects of past discrimination. Id. at 75-76. The court noted that the Department had "the prerogative to end the promotional quotas at any time, simply by developing acceptable promotion procedures." Id. at 76.
 
 
 47
 The district court, after a hearing, denied all motions to reconsider the December 15, 1983 order, to alter or amend the judgment, and to stay enforcement of the order pending appeal. Record, Vol. 3, at 578-81. The intervenors also moved this court for a stay pending appeal. That motion was denied on February 10, 1984. The Department, the United States, and the intervenors all filed timely notices of appeal. (Paradise I ). It appears that on February 6, 1984, eight black troopers and eight white troopers were promoted to the rank of corporal.
 
 II. PARADISE I
 
 48
 The principal issues on appeal are as follows: (1) whether the December 15, 1983, order of the district court constitutes an improper modification of the 1979 and 1981 Decrees; (2) whether the district court's order exceeds the district court's remedial authority under Title VII, as interpreted in Firefighters Local Union No. 1784 v. Stotts, --- U.S. ----, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); and (3) whether the district court's order unconstitutionally discriminates against, or unnecessarily trammels the interests of, white troopers.[12] We address these issues seriatim.
 
 
 49
 (a) Enforcement of the 1979 and 1981 Decrees
 
 
 50
 "A consent decree, although founded on the agreement of the parties, is a judgment." United States v. City of Miami, 664 F.2d 435, 439 (5th Cir.1981) (en banc). It therefore has the force of res judicata, and may be enforced by judicial sanctions, including a citation for contempt. Id. at 439-40. While a consent decree is a judgment, the decree also has many attributes of a contract between the parties. United States v. I.T.T. Continental Baking Co., 420 U.S. 223, 236, 95 S.Ct. 926, 929, 43 L.Ed.2d 148 (1975). It therefore "must be construed in the light of traditional tenets of contract construction." Roberts v. St. Regis Paper Co., 653 F.2d 166, 171 (5th Cir. Unit B 1981). In this regard, the "scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); Stotts, 104 S.Ct. at 2586; Turner v. Orr, 759 F.2d 817, 821 (11th Cir.1985); Roberts, 653 F.2d at 171. Appellate review of a district court's construction of a consent decree is akin to review of a district court's contract interpretation; in this aspect of the case, we thus are not bound by either the clearly erroneous rule or the abuse of discretion standard. See Turner, 759 F.2d at 821 (construction of consent decree is question of law subject to de novo review); Eaton v. Courtaulds of North America, Inc., 578 F.2d 87, 90 & n. 2 (5th Cir.1978) (interpretation of consent decree may be considered afresh by appellate court; Fed.R.Civ.P. 52(a) not applicable, and since issue is not whether trial court erred in approving consent decree, exercise of discretion is not in question). With these principles in mind, we have little difficulty rejecting the appellants' arguments that the district court improperly modified, rather than enforced, the 1979 and 1981 Decrees.
 
 
 51
 We initially note the district court's fidelity to the detailed procedural mechanism established in the 1979 and 1981 Decrees. The 1979 Decree, wherein the Department first obligated itself to develop within one year a promotion procedure having little or no adverse impact on blacks, allowed the plaintiffs to move the district court for an order enforcing the terms of the decree or for an order granting any other appropriate relief. See supra p. 1519. With the results of the 1981 corporal promotion examination in hand, the plaintiffs availed themselves of this provision. Because the parties were unable to agree on whether the examination adversely impacted on blacks, the district court was required, under the 1981 Decree, to resolve that issue. See supra p. 1521. In its order of October 28, 1983, the court recognized the requirements of the decrees, applied the four-fifths rule to the results of the examination, and found that the proposed promotion procedure adversely impacted on blacks. Paradise v. Prescott, 580 F.Supp. at 172-74. Again in keeping with the 1981 Decree, the court ordered the Department to submit a proposal for interim promotions. Id. at 175. The court stated that, under the 1981 Decree, the issue of promotions would be deemed submitted for resolution by the court if the parties failed to agree on a method for making promotions. Id.
 
 
 52
 The parties again failed to agree. With the various proposals of the parties before it, the court issued its ruling upon the method to be used for making promotions. See Paradise v. Prescott, 585 F.Supp. 72. The court specifically stated that "as required by the 1981 consent decree, [the parties] have requested that the court fashion a promotion procedure." Id. at 74.
 
 
 53
 Despite the district court's adherence to the procedural provisions agreed to by the parties to the decrees, the appellants claim that the December 15, 1983, order constitutes a modification of those decrees. In support of their position, they correctly note that the 1979 Decree provides that the Department agreed: (1) to have "as an objective ... an employment and promotion system that is racially neutral," Record Vol. 1, at 50; (2) "not to engage in any act or practice which discriminates on the basis of race in ... promoting;" id. at 52; and (3) to have as an objective the use of a "promotion procedure which is fair to all applicants." Id. at 53. We also agree with appellants that the 1981 Decree required the court to rule upon a promotion procedure "with little or no adverse impact." Id. at 104. The appellants reason that these provisions of the decrees prohibited the district court from ordering relief which was not racially neutral and resulted in adverse impact on whites.
 
 
 54
 Were we free to ignore the other provisions of the 1979 and 1981 Decrees, we might agree that the district court went beyond interpreting and enforcing the decrees. Our inquiry, however, is not confined to isolated provisions of the decrees. See Alliance to End Repression v. City of Chicago, 742 F.2d 1007, 1011 (7th Cir.1984) (en banc) ("The relevant 'four corners' are those of the decree, not of one provision of the decree."). Indeed, we must "presume that all parts of the decree have meaning and must be construed together." Roberts, 653 F.2d at 171. As we have seen, the 1979 Decree required the Department to implement a promotion procedure having little or no adverse impact on blacks seeking promotion. See supra p. 1519. The Department in that decree agreed to develop such a procedure within one year, and then to develop valid promotion procedures for the upper ranks. See id. These upper rank promotion procedures also were to have little or no adverse impact on blacks. Id. In the 1981 Decree, the Department reiterated its commitment to develop a promotion procedure having little or no adverse impact on blacks. See supra p. 1520. That decree also provided that "[i]f the selection procedure has little or no adverse impact against black applicants, selections shall be made in rank order." Record, Vol. 1, at 104 (emphasis added). All further references to "little or no adverse impact" obviously are references to adverse impact against blacks seeking promotion. Wholly absent from either decree is a prohibition on promotion procedures adversely impacting on whites. Indeed, two of the appellants expressly concede that the gravamen of the 1981 Decree concerns the effect of proposed promotion procedures on blacks, and blacks alone. See Brief for the United States at 21 ("[T]he primary concern of the 1981 Consent Decree is with promotion procedures as they affect blacks....") (emphasis in original); Brief of Intervenors at 20 ("Simply stated, the 1981 consent decree strived to create a situation where promotions will be made to corporal in a way that would have little or no adverse impact on blacks.").
 
 
 55
 Significantly, the parties to the 1981 Decree agreed "that it would be in the best interest of all [concerned] to avoid unnecessary litigation and to put a selection procedure for State Trooper Corporals in place as soon as possible." Record, Vol. 1, at 102. Moreover, the parties to the 1979 Decree agreed that plaintiffs could move to enforce the decree or "for any other relief which may be appropriate." Id. at 51. Fairly read, the 1979 and 1981 Decrees simply did not place the substantive limitation on the district court's enforcement authority that the appellants urge here. In our view, the district court, faced as it was with the Department's representation that promotions needed to be made immediately, did not modify the 1979 and 1981 Decrees or exceed the relief authorized by those decrees when it granted the plaintiffs' motion to enforce.[13]
 
 
 56
 (b) Firefighters Local Union No. 1784 v. Stotts
 
 
 57
 The appellants argue that even if the district court's December 15, 1983, order merely enforced the terms of the 1979 and 1981 Decrees, reversal is appropriate because the district court exceeded its remedial authority under Title VII. Appellants insist that after Stotts, --- U.S. ----, 104 S.Ct. 2576, 81 L.Ed.2d 483, a district court may not award affirmative equitable relief that benefits persons not found to have been actual victims of discrimination. Since in this case there never has been a finding of discrimination in promotions, and, perforce, no specific victims of promotion discrimination have been identified, the appellants contend that the district court erred in granting plaintiffs' motion to enforce the consent decrees. Having carefully reviewed the Stotts decision and cases interpreting it, we conclude that appellants read Stotts too broadly.
 
 
 58
 The Stotts case arose out of a class action filed in 1977 by black employees of the Memphis, Tennessee fire department. Plaintiffs charged that the fire department engaged in a pattern or practice of making hiring and promotion decisions on the basis of race, in violation of Title VII, 42 U.S.C. Sec. 2000e et seq., and 42 U.S.C. Secs. 1981 and 1983. Stotts, 104 S.Ct. at 2581. Prior to trial, the case was settled by a consent decree wherein the fire department agreed to promote certain individual firefighters, and also agreed to eventually increase minority representation in all job classifications to reflect the proportion of blacks in the relevant labor force. Toward this end, interim hiring and promotional percentage goals were established. The defendant did not, however, admit that any allegation in plaintiffs' complaint was true, nor did the consent decree mention what would happen in the event of layoffs. Id.
 
 
 59
 A little more than a year after the consent decree was entered, the City announced that fiscal problems necessitated a reduction in non-essential personnel. Layoffs were to be made according to the "last hired, first fired" rule of the city-wide seniority system. Plaintiffs sought relief in the district court to protect the advances by blacks made since the entry of the consent decree. Because the court found that the City's seniority system was not bona fide, and that the proposed layoffs would have a racially discriminatory effect on blacks, it enjoined the City from applying the "last hired, first fired" rule to the extent that it would decrease the percentage of blacks then employed in certain job classifications. Id. at 2582.
 
 
 60
 On appeal, the Sixth Circuit affirmed even though it disagreed with the district court's finding that the seniority system was not bona fide. 679 F.2d 541, 551 n. 6 (6th Cir.1982). The court of appeals reasoned that the district court's injunction enforced the terms of a valid consent decree, id. at 561, and, in any event, was a valid modification of the decree. Id. at 562-64.
 
 
 61
 The Supreme Court reversed. The Court stated that the issue at the heart of the case was "whether the District Court exceeded its powers in entering an injunction requiring white employees to be laid off, when the otherwise applicable seniority system would have called for the layoff of black employees with less seniority." Stotts, 104 S.Ct. at 2585 (footnotes omitted).
 
 
 62
 The Court first rejected the Sixth Circuit's holding that the injunction merely enforced the terms of the consent decree. Id. at 2585-86. The Court also found erroneous the Sixth Circuit's conclusion that the injunction was a proper modification of the consent decree even though the modification conflicted with the City's bona fide seniority system. The Court noted that Section 703(h) of Title VII, 42 U.S.C. Sec. 2000e-2(h), immunizes a bona fide seniority system from a Title VII challenge absent proof of an intention to discriminate. Stotts, 104 S.Ct. at 2587. The Court also relied on Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), and Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Those cases, the Court stated, made it clear that: (1) individual members of a class may be awarded competitive seniority if they can prove that they have been actual victims of a discriminatory practice; and (2) even where an individual proves that the discriminatory practice had an impact on him, he is not automatically entitled to the displacement of a non-minority employee to make room for him. Stotts, 104 S.Ct. at 2588. The Court reasoned that since there was no finding that blacks protected from layoff had ever been discriminated against, and since no blacks had been awarded competitive seniority, the Sixth Circuit "imposed on the parties as an adjunct of settlement something that could not have been ordered had the case gone to trial and the plaintiffs proved that a pattern or practice of discrimination existed." Id.
 
 
 63
 The Court also held that the injunction was not permissible as a valid Title VII remedial order. The Court stated that the Teamsters holding that competitive seniority can be awarded only to actual victims of illegal discrimination is consistent with the policy behind Sec. 706(g), 42 U.S.C. Sec. 2000e-5(g). The policy of that remedies provision "is to provide make-whole relief only to those who have been actual victims of illegal discrimination." Stotts, 104 S.Ct. at 2589.
 
 
 64
 We concede that a superficial reading of Stotts supports appellants' position. We view that case, however, as limited to its own facts, and factually and legally distinguishable from the one at bar.
 
 
 65
 First, as the Supreme Court itself was careful to note, the central issue in that case concerned the district court's authority to override a bona fide seniority system to require layoffs of more senior whites, in the absence of a showing of intentional discrimination. Here, the order under review involves promotions, not layoffs pursuant to a bona fide seniority system. Section 703(h) of Title VII simply is not a controlling factor in this case. See Turner, 759 F.2d at 824 ("there is no contention that a bona fide seniority system will be affected by the [remedy authorized by the consent judgment];" Stotts is therefore distinguishable); EEOC v. Local 638 Sheet Metal Workers' International Ass'n, 753 F.2d 1172, 1186 (2d Cir.1985) (remedies at issue were not "in direct conflict with a bona fide seniority plan that was protected by Sec. 703(h) of Title VII;" Stotts is therefore distinguishable), petition for cert. filed, --- U.S. ----, --- S.Ct. ----, --- L.Ed.2d ---- (1985); Vanguards of Cleveland v. City of Cleveland, 753 F.2d 479, 486 (6th Cir.1985) (consent decree did not have "the direct effect of abrogating a valid seniority system to the detriment of non-minority workers;" Stotts is therefore distinguishable); Kromnick v. School District, 739 F.2d 894, 911 (3d Cir.1984) ("no override of a bona fide seniority plan, and no requirement of race-conscious layoffs;" Stotts is therefore distinguishable), cert. denied, --- U.S. ----, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985); see also Deveraux v. Geary, 596 F.Supp. 1481, 1485 (D.Mass.1984) (Stotts "opinion [is] limited to a discussion of layoffs made in violation of a bona fide seniority system.").
 
 
 66
 Second, the defendant in Stotts never admitted that it had engaged in intentional discrimination. Here, there are judicial findings that the Department was so successful in its intentional exclusion of blacks from its ranks, that in the 37 years preceding the institution of this action the Department did not have a single black on its state trooper payroll. See EEOC, 753 F.2d at 1186 (Stotts distinguishable because there was a finding of intentional discrimination against nonwhites); NAACP v. Detroit Police Officers Ass'n (DPOA), 591 F.Supp. 1194, 1202 (E.D.Mich.1984) (same). Moreover, the 1979 and 1981 Decrees enforced by the district court were entered to overcome the manifest and chronic effects of the outright and total exclusion of blacks.
 
 
 67
 Third, Stotts was primarily a Title VII action. Here, the case was brought under the Fourteenth Amendment. See Detroit Police Officers Ass'n (DPOA), 591 F.Supp. at 1202 ("Stotts and the Title VII cases relied upon by the Supreme Court there rest on interpretations of Congressional intent in enacting Title VII, and contain no interpretation of the Fourteenth Amendment.").
 
 
 68
 Fourth, assuming this case is properly viewed as a Title VII case, Stotts did not involve the enforcement of a voluntarily negotiated consent decree. Rather, that case "dealt with the power of a court to modify a consent judgment over the objection of one of the parties." Turner, 759 F.2d at 824 (emphasis added); see Stotts, 104 S.Ct. at 2587 n. 9 ("[A] district court cannot enter a disputed modification of a consent decree in Title VII litigation if the resulting order is inconsistent with that statute."). We have held here, however, that the district court's order was fully authorized by the 1979 and 1981 Decrees. See Turner, 759 F.2d at 824.
 
 
 69
 Regardless of the scope of section 706(g) of Title VII, relied upon by the Court in Stotts, that section "does not limit the remedies to which parties may voluntarily agree under a consent judgment." Id.; see Vanguards, 753 F.2d at 487-88. Several decisions since Stotts make this unmistakably clear. This court stated in Turner that neither Section 706(g) nor the Stotts case, prevents a court from approving a consent decree that provides relief which is consistent with, but goes beyond, that authorized in the underlying statute. Turner, 759 F.2d at 824-26. Surely the district court's order enforcing the terms of the 1979 and 1981 Decrees is consistent with the purposes of Title VII. See id. at 826. Similarly, in Vanguards the Sixth Circuit had little difficulty upholding a voluntary affirmative action plan approved by the district court over the objection of a local union even though the seniority rights of non-minority employees were abridged. The court noted that Stotts did not hold that "consent decrees must strictly conform to the scope of relief available to a court in a wholly coercive action." Vanguards, 753 F.2d at 488. To hold that Title VII forbids voluntary affirmative action by an employer to the detriment of seniority rights of white employees would be to hold that Stotts overruled United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). Vanguards, 753 F.2d at 487-88. This the Sixth Circuit was not prepared to do. The Vanguards decision is consistent with another post-Stotts Sixth Circuit case. In Wygant v. Jackson Board of Education, 746 F.2d 1152 (6th Cir.1984), cert. granted, --- U.S. ----, 105 S.Ct. 2015, 85 L.Ed.2d 298 (1985), the court upheld a race-conscious layoff formula contained in a collective bargaining agreement between the board of education and the teachers union. Relying on Weber, the court characterized the formula as a valid "voluntary, race-conscious affirmative action plan," id. at 1158, which was "easier to defend in [court] than [a plan] mandated ab initio by federal trial courts." Id. at 1159; accord, Kromnick, 739 F.2d 894; see also Britton v. South Bend Community School Corp., 593 F.Supp. 1223, 1230 (N.D.Ind.1984) (collectively bargained "no minority layoff clause" survives Stotts challenge).
 
 
 70
 Based on the foregoing, we conclude that the district court's order enforcing the 1979 and 1981 Decrees is not rendered invalid by the Stotts decision. The district court's order will not be reversed simply because black troopers promoted under it have not been identified as specific victims of unlawful discrimination.[14]
 
 
 71
 (c) The Fourteenth Amendment
 
 
 72
 The intervenors claim that the district court's order enforcing the 1979 and 1981 Decrees violate their constitutional right to equal protection. We disagree.
 
 
 73
 The Supreme Court squarely confronted the constitutionality of race-conscious affirmative action plans in Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Unfortunately, "[n]o clear consensus emerged from the Court's decision." South Florida Chapter of the Associated General Contractors v. Metropolitan Dade County, Florida, 723 F.2d 846, 850 (11th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984). Nor did Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), produce a majority opinion on the equal protection issue. Hence, "determining what [equal protection reverse discrimination] 'test' will eventually emerge from the Court is highly speculative." South Florida Chapter, 723 F.2d at 851; see also Bratton v. City of Detroit, 704 F.2d 878, 885 (6th Cir.) ("The Supreme Court has not provided the kind of guidance in the constitutional context that [it has] under Title VII"), modified, 712 F.2d 222 (6th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984); Valentine v. Smith, 654 F.2d 503, 510 (8th Cir.) ("There is no [Supreme Court] consensus on what findings of past discrimination justify remedial action"), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); United States v. City of Miami, 614 F.2d 1322, 1337 (5th Cir.1980) ("We frankly admit that we are not entirely sure what to make of the various Bakke opinions. In over pages of United States Reports, the Justices have told us mainly that they have agreed to disagree"), aff'd in part and vacated in part and remanded, 664 F.2d 435 (5th Cir.1981) (en banc). In spite of the absence of a definitive Supreme Court standard on this issue, however, we recently stated with confidence:
 
 
 74
 "At this point in the history of the fight against discrimination, it cannot be seriously argued that there is any insurmountable barrier to the use of goals or quotas to eradicate the effects of past discrimination." United States v. City of Miami, Fla., 614 F.2d 1322 (5th Cir.1980), modified 664 F.2d 435 (5th Cir.1981)." "Without race and sex consciousness, the effects of past racial and sexual discrimination cannot be eradicated. Many cases have held racial and sexual goals to be appropriate." United States v. City of Alexandria, 614 F.2d 1358, 1365 (5th Cir.1980).
 
 
 75
 Palmer v. District Board of Trustees, 748 F.2d 595, 600 (11th Cir.1984) (footnotes omitted).
 
 
 76
 In City of Alexandria, 614 F.2d 1358, this court's predecessor held that the district court erred in not approving a consent decree which established long-term and interim employment goals for blacks and women. The court concluded that "goals and targets are acceptable under the Constitution ... so long as they are reasonably related to the legitimate state goal of achieving equality of employment opportunity." Id. at 1363 (footnote omitted). In fleshing out the "reasonableness" requirement, the court enumerated three factors which should be taken into account: (1) whether the remedial relief is temporary "and will terminate when the manifest [racial] imbalances have been eliminated;" (2) whether the relief establishes "an absolute bar to the advancement of white[s];" and (3) whether the relief will benefit only "qualified" persons. Id. at 1366.
 
 
 77
 More recently, in a different context, this court enunciated a somewhat different standard. In South Florida Chapter, 723 F.2d 846, we had occasion to examine the constitutionality of a county ordinance granting preferential treatment to blacks in the contract bidding process. We held that, in the circumstances of that case, a minority "set aside" provision and a minority "goals" provision were constitutional. For our purposes, the analysis employed in that case is more important than the result reached.
 
 
 78
 We recognized the absence of a definitive Supreme Court standard for judging the constitutionality of affirmative action. See id. at 850-52. After examining the various opinions found in Bakke and Fullilove, we concluded that the appropriate standard of review should account for the concerns common to the various views expressed in those two fragmented decisions. Using this approach, we concluded that legislation employing benign racial classifications generally will be upheld if: (1) the governmental authority has authority to pass such legislation; (2) adequate findings have been made to ensure that the legislation is remedying the present effects of past discrimination; and (3) the use of the classifications extends no further than the demonstrated need of remedying the present effects of the past discrimination. Id. at 851-52. Although not a formal "test," the approach used in South Florida Chapter was viewed as an attempt "to balance the legitimate objective of redressing past discrimination with the concerns that the chosen means be 'narrowly tailored' to the legislative goals so as to not unfairly impinge upon the rights of third parties." Id. at 852.
 
 
 79
 After South Florida Chapter was handed down, we decided Palmer, 748 F.2d 595. Although in Palmer the constitutional issue was not the subject of appeal, we suggested that an approach of the "type" outlined in Valentine, 654 F.2d 503, might have been appropriate if the constitutional issue had been presented. Palmer, 748 F.2d at 600 n. 14. In Valentine, the Eighth Circuit held that after a competent body has made findings of past discrimination, the constitutional inquiry is "whether the affirmative action plan is 'substantially related' to the objective of remedying prior discrimination." Valentine, 654 F.2d at 510; see Palmer, 748 F.2d at 600 n. 14. More specifically, the Eighth Circuit stated:
 
 
 80
 A race-conscious affirmative action program is substantially related to remedying past discrimination if (1) its implementation results or is designed to result in the hiring of a sufficient number of minority applicants so that the racial balance of the employer's work force approximates roughly, but does not unreasonably exceed, the balance that would have been achieved absent the past discrimination; (2) the plan endures only so long as is reasonably necessary to achieve its legitimate goals; (3) the plan does not result in hiring unqualified applicants; and (4) the plan does not completely bar whites from all vacancies or otherwise unnecessarily or invidiously trammel their interests.
 
 Valentine, 654 F.2d at 510.[15]
 
 81
 A review of the foregoing authorities convinces us that the differences between the various approaches are more of phraseology than of substance. In any event, we need not choose among them since, under either the City of Alexandria, South Florida Chapter, or Valentine approaches, the district court's order enforcing the 1979 and 1981 Decrees does not deprive the intervenors of their right to equal protection.
 
 
 82
 First, the long history of discrimination in the Department cannot be denied. In 1972, when the district court ordered quota hiring, the court noted that "[i]n the thirty-seven year history of the patrol there has never been a black trooper." NAACP v. Allen, 340 F.Supp. at 705. In 1975, the district court found that "the defendants have, for the purposes of frustrating or delaying full relief to the plaintiff class, artificially restricted the size of the trooper force and the number of new troopers hired." Record, Vol. 1, at 43. In 1979, when the defendants sought clarification or modification of the 1972 Order, the district court found that the effects of defendants' discrimination pervaded all levels of the Department. Paradise v. Shoemaker, 470 F.Supp. at 442. The court noted that the quota relief it ordered in 1972 was designed to provide an impetus to promote blacks into positions above the rank of entry-level trooper. Yet, "out of the 232 state troopers at the rank of corporal or above, there is still not one black." Id. (emphasis in original). To agree with defendants that the quota relief applied only to entry-level positions would be to "ignore that past discrimination by the Department was pervasive, that its effects persist, and that they are manifest." Id; see supra p. 1520. Faced with this poor track record, as well as additional allegations of discrimination, the Department agreed to the 1979 and 1981 Decrees which were enforced by the district court in its December 15, 1983, order. As we have held, those decrees, which were adopted as orders of the court, fully authorized the promotion quota now at issue. See supra Part II. (a). Just as clear is the fact that the relief now at issue was designed to remedy the present effects of past discrimination. See Paradise v. Prescott, 585 F.Supp. at 75.
 
 
 83
 The district court's requirement that the promotion quota remain in effect until either 25% of the rank is black or until a proper promotion procedure for that rank has been developed or implemented also was appropriate. The same ratio for hiring was ordered in the 1972 Order, and that ratio was affirmed on appeal. NAACP v. Allen, 493 F.2d 614. Additionally, the district court's 1975 Order made it clear that the 25% requirement was applicable for all ranks of the trooper force. Paradise v. Shoemaker, 470 F.Supp. 439; see supra p. 1519.
 
 
 84
 The district court's order enforcing the consent decrees also is substantially related to the objective of eradicating the present effects of past discrimination, and extends no further than necessary to accomplish the objective of remedying the "egregious" and long-standing racial imbalances in the upper ranks of the Department. Paradise v. Prescott, 585 F.Supp. at 75. As the district court observed, its order is a temporary measure designed only "to eliminate a manifest and chronic racial imbalance" caused by the Department's conduct. Id. at 76. The promotion quota will cease to exist when the percentage figure has been met, or the Department succeeds in doing what it promised to do years ago. Additionally, the district court's order does not require the discharge or demotion of a white trooper or the replacement of a white trooper with a black trooper. Id. Moreover, only qualified black troopers may be promoted pursuant to the order, and white troopers are not barred by it from advancement through the ranks. Id. Finally, the promotion quota ordered by the district court extends no further than necessary to ameliorate the present effects of the Department's past discrimination, effects which, as the history of this case amply demonstrates, "will not wither away of their own accord." Id. at 75.
 
 
 85
 We conclude that the district court's order enforcing the consent decrees is eminently reasonable given the history of this case. While the concern of intervenors' is understandable, we are not prepared to upset the considered judgment of the district court that "without promotional quotas the continuing effects of this [long-term, open and pervasive racial] discrimination cannot be eliminated." Id. at 76. Intervenors have not been denied their constitutional rights to equal protection by the district court's order enforcing the 1979 and 1981 Decrees.[16]
 
 
 86
 (d) Title VII
 
 
 87
 The intervenors also assert that the district court erred in not allowing them to present evidence on the "harsh impact" that the imposition of a promotion quota would have on them. Brief of Intervenors at 30. They argue that, notwithstanding the district court's finding to the contrary, the order enforcing the consent decrees "unnecessarily trammel[s] their interests." Id. The Department, whose standing to raise this issue is questionable, joins the intervenors on this issue.
 
 
 88
 The Supreme Court, in United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), upheld against a Title VII challenge a voluntary affirmative action plan established by the USWA and Kaiser Aluminum & Chemical Corp. The collectively-bargained plan set percentage hiring goals for blacks, and established training programs which reserved a specified percentage of openings for blacks. Id. at 198-99, 99 S.Ct. at 2724-25. The court held that "Title VII's prohibition in Secs. 703(a) and (d) against racial discrimination does not condemn all private, voluntary, race-conscious affirmative action plans." Id. at 208, 99 S.Ct. at 2729. The Court declined, however, to pronounce a bright line test for judging the permissibility of voluntary affirmative action plans. The Court simply held that the Kaiser-USWA plan was permissible under Title VII. The Court did, however, identify several factors it found important: (1) the purposes of the plan--to eliminate old patterns of racial segregation and hierarchy and to open to blacks jobs traditionally reserved for whites only--mirrored those of Title VII; (2) the plan did not unnecessarily trammel the interests of white employees by requiring their discharge and replacement with black employees; (3) the plan did not foreclose the advancement of white employees; and (4) the plan was a temporary measure. Id. at 208, 99 S.Ct. at 2729.
 
 
 89
 The district court concluded that the relief it ordered pursuant to the 1979 and 1981 Decrees was permissible under Weber. See Paradise v. Prescott, 585 F.Supp. at 75-76. The intervenors complain, however, that the district court had before it an inadequate factual basis to make that conclusion. Intervenors' position is untenable.
 
 
 90
 We initially note that intervenors failed to present this issue to the district court when the best opportunity to do so was presented. During the hearing on plaintiffs' motion to enforce and the intervenors' motion to intervene, held on May 27, 1983, the district court made it clear that one purpose of the proceeding was to "determine whether or not [the introduction of] evidence would be appropriate." Tr. at 34. Counsel for the intervenors, however, devoted the bulk of his argument to his clients' contention that the motion to enforce could not be granted absent evidence that blacks to be promoted were actual victims of unlawful discrimination. We have seen, however, that such evidence was not necessary to justify enforcement of the 1979 and 1981 Decrees. See supra Part II. (b). Counsel for intervenors did not at that time request an evidentiary hearing to determine whether the relief sought in plaintiffs' motion would unnecessarily trammel their interests.[17]
 
 
 91
 In any event, we conclude that the district court had before it an adequate factual basis to resolve the Weber issue. It is clear beyond cavil that the district court's order enforcing the 1979 and 1981 Decrees is consistent with the purposes of Title VII does not unnecessarily trammel the interests of intervenors by requiring their discharge and replacement with black troopers, does not absolutely bar their promotion to corporal, and is a temporary measure intended to eliminate a manifest racial imbalance. See Weber, 443 U.S. at 208-09, 99 S.Ct. at 2729-30. Under these circumstances, the district court was not required to hold an additional evidentiary hearing.
 
 III. PARADISE II
 
 92
 Shortly after the district court entered the order appealed from in Paradise I, the Department, pursuant to that order, filed its schedule for developing promotion procedures for all ranks above the entry level position. Record, Vol. 3 at 569-70. That schedule was approved by the district court. Id. at 627. Thereafter, on June 19, 1984, the Department filed a statement of completion of selection procedure for promotion to the rank of corporal and a motion to approve the procedure. Record, Vol. 1, at 9 and 12, No. 84-7564. The court directed the other parties to submit written responses to the Department's motion, and set the matter for a hearing, which was held on July 3, 1984.
 
 
 93
 Briefly put, the proposed selection procedure was comprised of the following: (1) administration of a written examination to all candidates for promotion; (2) preliminary ranking of all candidates based on examination scores and service ratings; (3) certification of the top-ranked candidates for structured oral interviews; and (4) evaluation of each certified candidate, based on his or her interview, as "best qualified," "highly qualified," "qualified," or "not qualified." All candidates within each of these categories were to be equally eligible for promotion. The Department, which had administered the proposed selection procedure prior to the filing of its motion, wished to begin making promotions from among the 13 "best qualified" candidates.
 
 
 94
 The written examination was given to 256 candidates, of whom 179 (69.9%) were white and 77 (30.1%) were black. Before the examination was given, the Department had decided to use the written examination and service rating as a screening device to determine who would be certified for oral interviews. If 15% of the top 25% of those participating in the initial portion of the promotion procedure were black, the Department planned to certify the top 25% as eligible for oral interview. A preliminary ranking of test scores and service ratings, however, revealed that of the top-ranked 64 (25% of 256) candidates only three were black (4.7% of 64). To insure that 15% of the top 25% were black, and to avoid passing over any white candidates to achieve this objective, the Department decided to certify the top 116 candidates. Of these, 105 (90.5%) were white and 11 (9.5%) were black. The difference in scores between the white candidate ranked # 64 and the black candidate ranked # 116 was 1.2 points out of a total of 100 possible points (96.25 and 95.05, respectively). Intervenor Bailey ranked # 14 with a score of 98.37, intervenor McClellan ranked # 33 with a score of 97.27, intervenor Davenport ranked # 53 with a score of 96.69, and intervenor Mansell ranked # 56 with a score of 96.62.
 
 
 95
 The oral interview panel consisted of three persons. The panel asked the candidates six structured questions. Each member of the panel then independently rated the responses of each applicant. As a result of the interviewing process, 13 candidates--10 white and 3 black--were rated "best qualified;" 51 candidates--46 whites and 5 black--were rated "highly qualified;" 46 candidates--43 white and 3 black--were rated "qualified;" and 4 candidates, all white, were rated "not qualified." Two white candidates did not appear for their interviews. Of the three black candidates among the top-ranked 64 candidates in the preliminary ranking, one was rated "best qualified" and the other two were rated "highly qualified." Of the 61 white candidates among the 64, eight were rated "best qualified;" 29 (including intervenors Bailey and McClellan) were rated "highly qualified;" 22 (including intervenor Mansell) were rated "qualified;" and 2 (including intervenor Davenport) were not rated in any of these three categories. The 3 black candidates among the "best qualified" candidates were originally ranked # 34, # 68, and # 76. The ten white candidates in this category originally ranged from # 2 to # 102. As is apparent, there is no readily discernible correlation between a candidate's preliminary ranking before the oral interviews and his or her final rating.
 
 
 96
 As we have seen, the Department indicated that it intends to promote only those in the "best qualified" list. When the "best qualified" list is exhausted, the Department will administer a new examination and candidates will be interviewed.
 
 
 97
 The plaintiffs and the United States suggested that the Department be permitted to employ the proposed selection procedure, but that any approval of further use of the procedure be withheld pending discovery and a hearing on the validity of the procedure. The intervenors, however, objected to any use of the Department's proposed selection procedure pending discovery and a final determination of the content validity of the procedure.
 
 
 98
 The district court, on July 27, 1984, ruled on the Department's motion. The court allowed the Department to select corporals in a nondiscriminatory manner from the candidates rated "best qualified" and suspended the 1-for-1 corporal promotion quota as to any such promotions. Record, Vol. 1, at 116, No. 84-7564. The court ordered the defendants to give notice to all parties of any proposed corporal promotions at least 5 days prior to the effective date of promotion. If a party objects to a proposed promotion, the promotion will be stayed until further order of the court. Id. The court gave the parties leave to conduct discovery on the issue of whether the selection procedure is valid as job-related under the Uniform Guidelines and in compliance with the 1979 and 1981 Decrees. Id. at 117. The court indicated that it would conduct further proceedings to determine whether future administrations of the Department's proposed selection procedure may be used without judicial intervention, and enjoined corporal promotions other than from the 13 "best qualified" candidates. Id.
 
 
 99
 Only the intervenors appealed the July 27, 1984 order. Thereafter, the Department notified the other parties of their intention to make nine corporal promotions from the "best qualified" list. The intervenors objected, and moved the district court to stay operation of the July 27 order and any promotions made under it. Id. at 168-71. The district court denied the motion for stay, and the promotions subsequently were made.
 
 
 100
 (a) Issues
 
 
 101
 Although intervenors raise a number of issues on appeal, we agree with the United States that the only issue properly before this court is whether the district court's July 27, 1984 order exceeds the district court's remedial authority or otherwise violates the law.[18] For the reasons which follow, we affirm.
 
 
 102
 (b) Discussion
 
 
 103
 The intervenors argue that the district court's approval of the Department's promotion procedure "extends beyond the remedial authority allowed ... by Sec. 706(g) of Title VII, ... is inconsistent with ... Stotts [,] and ... violates the rights of the intervenors guaranteed by the United States Constitution and both federal and state law." Brief of Intervenors at 18. In their view, the promotion procedure is unlawful because it was designed to guarantee preferential treatment to persons not proven to be victims of discrimination. The intervenors suggest that because the Department was operating under the 1979 and 1981 Decrees, "some number of promotions were ... guaranteed or assigned for blacks." Id. at 9.
 
 
 104
 The intervenors identify two points in the promotion procedure wherein impermissible quotas allegedly were imposed: when the Department decided to certify the top 116 candidates for oral interviews and the evaluation of certified candidates as "best qualified." The intervenors suggest that 116 candidates, as opposed to the top 64 (25%), were certified for oral interviews to satisfy the adverse impact requirement of the consent decrees. They also suggest that 13, and only 13, candidates were rated "best qualified" in order to satisfy the immediate promotional needs of the Department while guaranteeing "that a requisite number of blacks, in this case three, would be promoted." Id. at 17.
 
 
 105
 Defendants ignore the fact that by certifying 116 candidates for oral interviews, no white candidates were passed over in favor of blacks scoring lower on the examination. Thus, the benefit of an oral interview and the possibility of promotion was conferred equally on similarly situated candidates of both races. Moreover, contrary to intervenors' suggestion, the decision to expand the class of candidates to be certified was not arbitrary. As we have seen, a large pool of candidates scored better than 95 out of 100 possible points, and numerical distinctions between the candidates ranked # 64 through # 116 were insignificant. See supra p. 1535. All candidates certified for oral interview thus demonstrated substantial qualification for promotion by scoring better than 95 on this phase of the promotion procedure.
 
 
 106
 The Department also cannot be faulted for employing an oral interview component in its promotion procedure when the scores of the top-ranked candidates were so closely grouped. The Department's determination that "merit" could best be measured by a combination of factors rather than by rank order use of scores on the written examination is also supported by the function performed by the oral interviews. As counsel for the Department stated in the district court: "These [oral interview] questions were designed to determine: one, how that candidate thought under stress, how he could think on his feet, communication skills, his career objectives, knowledges and goals of the duties of the Department ..., and his overall ability to perform as a supervisor in the Department...." Tr. at 16-17, No. 84-7564. Furthermore, the decision to require candidates for promotion to undergo oral interviews was particularly appropriate where the written examination had not been validated.
 
 
 107
 The intervenors' assumption that 13 "best qualified" candidates were selected to guarantee that a certain number of blacks would be promoted also is unwarranted. The intervenors introduced no evidence whatsoever in support of this charge. Indeed, the record indicates otherwise. Counsel for the Department represented to the district court that the interviewers were not "coached" or instructed on how the interviewees were to be graded. "They were not told anything. They were told to select the best candidates that appeared before them. There was no ... they were not given any quotas or goals or any racial composition at all." Id. at 29-30. Additionally, since there were no limits on how many candidates could be rated "best qualified," and since the Department intends to promote only from the "best qualified" list, we fail to see how the intervenors' chances for promotion have been materially affected by the certification of 116 candidates, rather than 64, for oral interview.
 
 
 108
 We conclude that, regardless of the wisdom of our various holdings in Paradise I, intervenors simply have failed to show that the Department's promotion procedure imposes promotion quotas or otherwise accords preferences or benefits to black candidates for promotion at the expense of more qualified white candidates. Rather, the record shows that the Department's promotion procedure is fair to all applicants, white and black, and that only merit factors were considered in the selection of the 13 "best qualified" candidates from the 116 certified for oral interviews. The district court therefore did not exceed its remedial authority under Title VII when it approved the Department's promotion procedure. Moreover, since the promotion procedure approved by the district court does not involve "reverse discrimination" against white candidates for promotion, the intervenors' other contention also must fail.[19]
 
 
 109
 The district court's orders in Paradise I and Paradise II are AFFIRMED.
 
 
 
 *
 Honorable Floyd R. Gibson, U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 For the most part, then Chief Judge Johnson presided over this litigation until he assumed his position on the former Fifth Circuit in 1979. The case was then transferred to the docket of District Judge Varner. The case was reassigned to Judge Thompson in October, 1980, shortly after his appointment to the district court
 
 
 [2]
 In a supplemental opinion the court also awarded plaintiffs attorney's fees because of the defendants' bad faith defense of the lawsuit. The court reasoned: "[D]efendants unquestionably knew and understood that their discriminatory practices violated the Fourteenth Amendment ..., see United States v. Frazer, 317 F.Supp. 1079 (M.D.Ala.1970), [thus] their defense of this lawsuit amounts to unreasonable and obdurate conduct which necessitated the expense of litigation." NAACP v. Allen, 340 F.Supp. at 708
 In Frazer, then Chief Judge Johnson held that the Alabama Personnel Department, which administered the state merit system and supplied employees to all state agencies, including the Department, unconstitutionally discriminated against blacks. This finding was predicated on, among other things; (1) the defendants' systematic refusal to appoint qualified black applicants; (2) the defendants' practice of appointing and preferring lower-ranking white applicants; (3) the defendants' discriminatory recruiting and advertising practices; and (4) the defendants' practice of segregating state employees by race in the use of facilities. Frazer, 317 F.Supp. 1089-90.
 
 
 [3]
 The Eleventh Circuit, in Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), adopted as precedent decisions of the former Fifth Circuit handed down prior to October 1, 1981. We also are bound by decisions of Unit B of the former Fifth Circuit rendered after that date. Stein v. Reynolds Secs., Inc., 667 F.2d 33, 34 (11th Cir.1982)
 
 
 [4]
 The court relied heavily on Morrow v. Crisler, 491 F.2d 1053 (5th Cir.) (en banc), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974), a factually similar case involving the Mississippi Highway Patrol (MHP). In Morrow, a panel of the Fifth Circuit affirmed the district court's finding that the MHP unconstitutionally discriminated against blacks in hiring and employment. Morrow v. Crisler, 479 F.2d 960, 962 (5th Cir.1973). The panel also upheld the district court's refusal to order affirmative hiring relief, finding that the court did not abuse its discretion. Id. at 963-65. In light of a supplemented appellate record, however, the en banc Court held that the district court's injunction did not order sufficient injunctive relief to eradicate the effects of the defendants' discriminatory employment practices. The Court therefore remanded the case to the district court to fashion a decree which would have the "certain" result of integrating the MHP. Morrow v. Crisler, 491 F.2d at 1055. The Court further held that the district court would have to order some affirmative hiring relief, such as "temporary one-to-one or one-to-two hiring, the creation of hiring pools, or a freeze on white hiring," id. at 1056, until the residual effects of past discrimination were eliminated
 
 
 [5]
 The defendants also agreed that the promotion procedure would conform with the 1978 Uniform Guidelines of Employee Selection Procedure, 28 C.F.R. Sec. 50.14. These guidelines were adopted by the Equal Employment Opportunity Commission, the Department of Labor, the Department of Justice, and the Civil Service Commission, to satisfy "[t]he Federal government's need for a uniform set of principles on the question of the use of tests and other [employee] selection procedures." Id. Sec. 1A
 
 
 [6]
 During the period in which a new promotion procedure for the rank of corporal was being validated, the defendants agreed to use the existing state merit system for all promotions to that rank provided that at least three black troopers were promoted. Record, Vol. 1, at 53. Exactly how this was to be done was detailed in a document styled "Agreement of Counsel for the Parties." Id. at 58-59
 
 
 [7]
 The defendants asked the court to strike the 25% quota and to order that 1-for-1 hiring continue only until (1) a valid examination was used to produce a new hiring list, or (2) 25%, or (3) 15% of the entry-level positions were filled by blacks. Id. at 62
 
 
 [8]
 The proposed promotion procedure was comprised of four components weighted as follows: written test--60%; length of service--10%; supervisory evaluation--20%; service ratings--10%. Id. at 102; R.E. at 100
 
 
 [9]
 Under Section 4D of the Uniform Guidelines, "[a] selection rate for any race ... which is less than four-fifths ( 4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded ... as evidence of adverse impact." 28 C.F.R. Sec. 50.14
 
 
 [10]
 In support of enforcement, the United States noted that: (1) the defendants had yet to submit a proposal for making promotions in conformity with the 1979 and 1981 Decrees; (2) no corporal promotions had been made, despite the defendants' representation the year before that there was a "current need" for such promotions; and (3) the defendants failed to offer any reasons why promotions should not be made, nor had they offered an explanation as to why they halted progress toward remedying the effects of past discrimination. Record, Vol. 2, at 199-201. The United States maintained that the failure to promote corporals thwarted the purposes of the orders entered in the case, and that the failure to present a promotion plan in accordance with the 1979 and 1981 Decrees "suggests that a pattern of discrimination against blacks in the Department ... may be continuing." Id. at 200
 
 
 [11]
 The court rejected the defendants' argument that section 4D of the Uniform Guidelines entitled them to an opportunity to present evidence in support of their position that the selection procedure did not have an adverse impact. That section provides in part that "[g]reater differences in selection rate may not constitute adverse impact ... where special recruiting or other programs cause the pool of minority ... candidates to be atypical of the pool of applicants from that group." 28 C.F.R. Sec. 50.14. The defendants contended that the 1-for-1 hiring quota was such a "special program" resulting in an atypical pool, since black troopers scored lower on a hiring test than did white troopers. Paradise v. Prescott, 580 F.Supp. at 173. Accepting as true the defendants' representation that blacks did score lower on this test than whites, the court reasoned that such proof was "an unacceptable basis to rest a claim of atypicality." Id. at 174
 
 
 [12]
 The intervenors and the Department raise a number of other arguments, most of which proceed from the erroneous assumption that the district court modified the 1979 and 1981 Decrees. We have considered all of these arguments and find them to be without merit. We pretermit any discussion of them except as they directly relate to the principal issues set forth in the text of the opinion. See infra notes 14 and 16
 
 
 [13]
 The Department and the United States cite United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), as the Supreme Court benchmark governing modification of consent decrees. In that case, the Court recognized the inherent authority of a court to modify a consent injunction if that injunction "has been turned through changing circumstances into an instrument of wrong." Id. at 115, 52 S.Ct. at 462. More specifically, the Court held that an injunction should not be modified at the instance of a defendant absent "a clear showing of grievous wrong evoked by new and unforeseen conditions." Id. at 119, 52 S.Ct. at 464. A defendant accordingly bears a heavy burden to justify modification of a valid consent judgment
 It appears, however, that a plaintiff seeking modification of a consent judgment generally bears a lighter burden. In United States v. United Shoe Mach. Corp., 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), the Court drew a sharp distinction between a case where the defendant, as in Swift & Co., seeks to escape the impact of a decree, and a case where a plaintiff seeks modification of a decree to achieve the purposes of the provisions of the decree. Id. at 249, 88 S.Ct. at 1499. In the latter situation, a court may have the duty to modify the decree to avoid frustration of the decree's purposes. See id. at 251-52, 88 S.Ct. at 1501 ("If the decree has not, after 10 years, achieved its 'principal objects' ... the time has come to prescribe other, and if necessary more definitive, means to achieve the result. A decade is enough.)" In short, were we to construe the plaintiffs' motion to enforce as a motion to modify, we probably would not be constrained by the rigorous Swift & Co. standard. See Newman v. Graddick, 740 F.2d 1513, 1520 (11th Cir.1984) (consent decree may be modified if "significant time has passed and objectives have not been met").
 Even if the district court's December 15, 1983 order is properly viewed as a modification of the 1979 and 1981 Decrees, a good case could be made for affirmance. When that order was issued, nearly five years had passed since the 1979 Decree had been entered. Yet the 1979 Decree had not achieved its objectives of having in place promotion procedures for all ranks in the trooper force. Indeed, the Department had failed to implement a promotion procedure having little or no adverse impact on blacks for the rank of corporal. In light of our holding that the district court did not modify the consent decree, however, we need not decide whether modification was warranted in the absence of an evidentiary hearing.
 
 
 [14]
 Given our holding, the district court's failure to hold an evidentiary hearing to determine whether or not the black troopers to be promoted under the plaintiffs' motion to enforce had in fact been discriminated against does not constitute reversible error
 
 
 [15]
 The Sixth Circuit has adopted a similar approach, concluding that the only clear consensus to be garnered from Bakke and Fullilove is that an affirmative action plan must (1) serve some governmental interest, and (2) must somehow be directed toward the achievement of that objective. Bratton, 704 F.2d at 885. The Sixth Circuit's approach is essentially two-tiered. First, because the government has a significant interest in ameliorating the effects of prior discrimination, remedial action may be taken towards that end. Id. at 886. Second, remedial actions pass constitutional muster if the measures employed are reasonable. Id. at 887. "Reasonableness" is determined by examining the facts of the case to see "whether any discrete group or individual is stigmatized by the program and whether racial classifications have been reasonably used in light of the program's objectives." Id.; see Detroit Police Officers' Ass'n v. Young, 608 F.2d 671, 694 (6th Cir.1979), cert. denied, 452 U.S. 983, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981); see also Wygant, 746 F.2d at 1157 (quoting Wygant v. Jackson Bd. of Educ., 546 F.Supp. 1195, 1201 (E.D.Mich.1982)) ("The reasonableness test asks whether the affirmative action plan is 'substantially related' to the objectives of remedying past discrimination and correcting 'substantial' and 'chronic' underrepresentation.")
 
 
 [16]
 Similar to their contention regarding Title VII and the Stotts case, intervenors and the Department argue that the district court's order enforcing the decrees is unconstitutional since there is no evidence in the record that the Department has intentionally discriminated against black troopers seeking promotions. We disagree for essentially two reasons. First, these appellants assume that the district court's order amounts to a disputed modification of the 1979 and 1981 Decrees. We have held, however, that the district court merely enforced the terms of those decrees. See supra Part II(a). Second, it is no answer in this case to say that plaintiffs have not proven that the Department has discriminated against blacks above the entry-level seeking promotions; there were no blacks holding such positions until 1979, and even then the only black troopers promoted obtained their promotions pursuant to the 1979 Decree, not the voluntary action of the Department. On the other hand, it cannot be gainsaid that white troopers promoted since 1972 were the specific beneficiaries of an official policy which systematically excluded all blacks. We conclude that, in these circumstances, a finding of departmental discrimination against blacks in promotions was not a necessary predicate for granting the plaintiffs' motion to enforce
 
 
 [17]
 We admit that intervenors were in a somewhat ambiguous position at this hearing in that the court was hearing argument on the need for evidence vis a vis plaintiffs' motion to enforce as well as on the motion to intervene. The fact remains, however, that intervenors were painfully aware of the motion to enforce and the relief sought therein for quite some time. We agree with the district court's response to intervenors' suggestion that they were unable to respond to plaintiffs' motion until the court had ruled on the motion to intervene: "Haven't you had the file before you? Haven't you had an opportunity to go through it? This is not an evidentiary hearing, you know the motion was filed, and you've read it. I'll hear you on it." Tr. at 25
 
 
 [18]
 The intervenors devote most of their argument to an attack on the 1979 and 1981 Decrees. They argue that these decrees, which serve as "charters" for all promotional procedures to be developed by the Department, Brief of Intervenors at 13, No. 84-7564, are unlawful in that they sanction prospective race-conscious relief to individuals who have not been shown to be victims of discrimination. Intervenors also argue that these decrees have been rendered invalid by Stotts, and violate their constitutional rights and rights under the state merit system. Intervenors finally contend that, in light of Stotts, the decrees must be modified. Although most of these arguments probably have been answered by our resolution of Paradise I, we agree with the appellees in this case that the validity of the 1979 and 1981 Decrees is not properly before this court
 Intervenors correctly note that since they were not parties to the 1979 and 1981 Decrees, it cannot be said that they consented to the terms of those decrees. See Stotts, 104 S.Ct. at 2586; Reeves v. Wilkes, 754 F.2d 965, 971 (11th Cir.1985). The intervenors nonetheless have not appealed the district court's ruling that they "may participate in these proceedings on a prospective basis only and may not challenge previously entered orders, judgments, and decrees since intervention is untimely as to these." Record, Vol. 2, at 309. The soundness of that ruling accordingly is not before us, though we would be hard-pressed to reverse it in light of recent circuit precedent. See Reeves, 754 F.2d 965. It is one thing to say that the July 27, 1984 order violates their rights or exceeds the court's authority; it is quite another to say the same about the 1979 and 1981 Decrees.
 Intervenors also argue that the 1979 and 1981 Decrees should be modified. Quite apart from the fact that the intervenors are in this action on a prospective basis only, curiously absent from the record is any indication that a motion seeking modification has been submitted to the district court. In their proposed opinion and order submitted to the district court after the July 3, 1984 hearing on the Department's motion, the intervenors proposed that they "should be allowed the right to file appropriate pleadings seeking a modification of those consent decrees." First Supp. Record, Vol. 1, at 3. The intervenors, however, also expressly stated that consideration should be given to modifying the decrees only at a future hearing, and then only "if appropriate pleadings are filed." Id. In the order appealed from, the district court neither acknowledged the intervenors alleged right to modify the decrees, nor did it deny them that right. Since no party has asked the district court to modify the decrees, that issue is not properly before us.
 
 
 [19]
 When the district court overruled the motions to reconsider, alter or amend, and stay enforcement of the order enforcing the 1979 and 1981 Decrees, it predicted that use of the promotion quota might be a "one-time occurrence" in light of the defendants' pledge to promptly develop promotional procedures conforming with the consent decrees. R.E. at 178. The reasonableness of the order enforcing the decrees and the accuracy of the district court's prediction are attested to by recent events
 After the district court entered the July 27, 1984 order, the defendants moved the court for approval of a proposed selection procedure for promotions to sergeant. The court thereafter entered an order similar to the July 27 order, suspending the 1-for-1 promotion quota for that rank, allowing sergeant promotions from among the "best qualified" candidates for promotion to that rank, and prohibiting other sergeant promotions until further order of the court. Additionally, the defendants have been allowed to promote only white troopers to the lieutenant and captain ranks since there apparently are no black troopers qualified for promotion to those ranks.
 The recent progress made by the Department also reinforces our conclusion that the quota relief granted by the district court was necessary to commence the process of eliminating the present effects of the Department's past discrimination. It seems that the 1-for-1 promotion mandate, which has been used only once, has given the Department the incentive to comply now with its obligations under the law and the 1979 and 1981 Decrees. It thus appears that the principal effect of the order enforcing the decrees might be the development of acceptable promotion procedures for all ranks and the nullification of the promotion quota.