**Clarence Edward PALMER,**
**Plaintiff-Appellant,**

v.

**The DISTRICT BOARD OF TRUSTEES OF ST. PETERSBURG JUNIOR COLLEGE, Defendant-Appellee.**

No. 83–3568.

United States Court of Appeals,
Eleventh Circuit.

Dec. 12, 1984.

Rehearing and Rehearing En Banc Denied Jan. 16, 1985.

Richard T. Donelan, Jr., Frank & Kelly, Mark F. Kelly, Tampa, Fla., for plaintiff-appellant.

James M. Blue, Tampa, Fla., Charles T. Dillon, St. Petersburg, Fla., for defendant-appellee.

Before TJOFLAT and FAY, Circuit Judges, and ALLGOOD,* District Judge.

PER CURIAM:

On February 23, 1981, Clarence Edward Palmer (Palmer) filed this action against The District Board of Trustees of St. Petersburg [Florida] Junior College (Board). The complaint invoked jurisdiction pursuant to 42 U.S.C. § 2000e–5(f); 29 U.S.C. § 626(c)(1) (ADEA); and to 28 U.S.C. §§ 1331 and 1343 to pursue claims under 42 U.S.C. §§ 1981 and 1983. Plaintiff also sought relief under the provisions of Florida Statute § 23.167(12) and Florida Statute § 295.11.[1]

On February 17, 1982, the trial court denied the Board's motion for summary judgment as to the Title VII claim, but granted it as to the ADEA claim, the §§ 1981 and 1983 claims, and the claims under the Florida statutes.

On July 28, 1982, the parties filed a Pretrial Stipulation which admitted certain facts. Both parties thereafter filed motions for summary judgment with regard to the Title VII claim. On August 25, 1983, the trial court granted the Board's motion for summary judgment and entered a final judgment against Palmer as to all claims. Palmer filed notice of this appeal on September 16, 1983.

The only issues raised by Palmer on this appeal are whether the trial court erred in granting the Board's motion for summary judgment as to the Title VII and ADEA claims and in denying Palmer's motion for summary judgment as to the Title VII claim. Palmer has not raised any specific issue with regard to the §§ 1981 and 1983 claims.[2]

*Admitted Facts*

As of 1973, the United States Department of Health, Education and Welfare (HEW) and the United States District Court for the District of Columbia had found that the State of Florida maintained a racially segregated system of higher education.[3] After various actions by the Florida Commissioner of Education and HEW and further court proceedings,[4] the State of Florida developed a statewide higher education desegregation plan which included as one of its parts, "The State Equal Access/Equal Opportunity Plan for the Florida Public Community College System" (Plan). The Plan was approved by the Community College Presidents on August 26, 1977, and by HEW in February 1978 as one part of Florida's affirmative action plan. St. Petersburg Junior College (College) is a community college. The College has been subject to the Plan since August 26, 1977.[5]

---

* Honorable Clarence W. Allgood U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. In his reply brief filed in this court, plaintiff has abandoned any direct claims under Florida law based on his interpretation of *Pennhurst State School and Hospital v. Halderman*, —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Palmer continues to maintain that the failure of the Board to grant him a Veteran's preference under the provisions of § 295.11 should be considered as an evidentiary factor in connection with his Title VII and ADEA claims.

2. §§ 1981 and 1983 claims require the same elements of proof as a Title VII action. *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir.1980).

3. See *Adams v. Richardson*, 351 F.Supp. 636 (D.D.C.1973); aff'd. *Adams v. Richardson*, 480 F.2d 1159 (D.C.Cir.1973).

4. See *Adams v. Califano*, 430 F.Supp. 118 (D.D.C.1977).

5. Among the Plan's provisions were the following:
    E. Each college shall develop and implement as part of its Equal Access-Equal Opportunity plan an affirmative action employment plan which shall include specific employment goals and related timetables for achieving them. The plan shall include a current (October, 1977) employment profile and a year-by-year projection through October 1, 1981. The profile shall utilize the current OCR definitions of employment categories.
    1. The 1981 goal for the racial mix in the professional staff should approximate the percentage of black persons receiving master's degrees from colleges and universities in the Southern states, i.e., ten percent. Professional staff shall be defined as those persons employed in the executive, administrative, and

Records submitted by the college pursuant to the Plan for the years 1976–1981 reflect the following statistical data:

| Year | Black Instructors | Total Full-time Instructors | Approximate Percent |
|------|------|------|------|
| 1976 | 18 | 298 | 6% |
| 1977 | 17 | 312 | 5.5% |
| 1978 | 23 | 349 | 6.5% |
| 1979 | 26 | 334 | 7.8% |
| 1980 | 31 | 337 | 9% |
| 1981 | 35 | 353 | 10% |

The College adopted the affirmative action goal of raising the percentage of black instructors to ten percent of the total faculty members by 1981. The College's affirmative action plan was approved by the State Division of Community Colleges and HEW.

The College's affirmative action plan did not require, or result in, the hiring of unqualified persons. The plan was designed to result in the hiring of a sufficient number of qualified minority applicants so that the racial balance of the College's faculty would approximate ten percent of the total number of faculty, which was the balance that would have been achieved absent the past discrimination. HEW and the State Division of Community Colleges found that approximately ten percent of those persons graduating from Florida's colleges and universities who were qualified for instructor positions at a community college like the College were black. The College's affirmative action plan extended only until October 1, 1981. The Plan did not completely bar white persons from employment in faculty positions.

At all times material to this case, the College's affirmative action plan required that for each vacant faculty position at the College at least one (1) of the four (4) qualified applicants recommended by a Search and Screening Committee be black. The affirmative action plan did not require that a qualified black or white be hired nor did the plan require that any white instructors be fired. Pursuant to the Plan, if a qualified black was not among the four (4) recommended and qualified applicants, the person who was hired in the position would receive a nine-month temporary appointment. At the expiration of that temporary appointment, the then vacant position was advertised and the recruitment begun anew. The person whose temporary appointment had expired was not excluded from consideration when the search and recruitment process was reinstituted the next year. If the person who held the temporary appointment wished to be considered for the job, a new application had to be filed and he was treated by the Search and Screening Committee as one of a number of applicants for the position. Other than the requirement that a black be included among the final four, the College's affirmative action plan did not require that preferential treatment be given to blacks.

In the spring of 1978, the College's administrators decided to hire a full-time vocal music instructor.[6] The vacancy was advertised through the State of Florida applicant pool of public positions. The vacancy was widely advertised in local and national periodicals, at various institutions of higher learning, including minority colleges, and elsewhere. Palmer, who is white and at all pertinent times was over 40 and less than 70 years old, was one of

managerial; instructional; and, professional categories.

\* \* \* \* \* \*

*Each college* and the *Division Office* shall establish a goal, by job category, that not less than ten percent of its professional staff shall be composed of black persons not later than October 1, 1981. Any college which does not believe that it can achieve the ten percent goal shall cite its reasons for establishing a goal of less than ten percent. Any college or the Division Office failing to show substantial progress each year toward meeting its goal

shall provide complete documentation of its affirmative action efforts....

By October 1, 1981, it is the goal of the Florida Community College System in each institution in the system to achieve employment ratios as follows:

2. *In each institution* in the instructional category, not less than ten percent black persons; ....

6. In 1978, the College was in a poor comparative position with regard to other state community colleges, in the number of blacks employed as instructors.

115 applicants.[7] The final four applicants were all white males. Although there were no blacks represented in the final four candidates selected by a Search and Screening Committee, there was documentation in the record that the search was diligent, thereby satisfying an alternative component of the Plan. After considering the final four candidates, Joe Madden, Director of the Division of Communications at the College, recommended Palmer for employment.[8] Nevertheless, because there had been no qualified black persons among the four applicants, the College's president refused to approve the recommendation that Palmer be employed on a permanent basis, but instead approved the appointment on a nine-month temporary basis.

Palmer commenced his teaching duties in August 1978 and was notified by the College that he could reapply for the position for the following school year.[9] In 1979 a new search was conducted and of eleven total applicants, four finalists were chosen —Palmer, Ira Spaulding (a black male) and two other black males. Neither Madden nor the Search and Screening Committee were directed by any administrator at the College to hire or recommend a black person to fill the vocal music instructor position in 1979. There were no directives from the administration at the College stating that Palmer was barred from employ-ment or from consideration for employment as vocal music instructor in 1979.

The faculty members on the Search and Screening Committee were divided in their opinion as to who was best qualified. Two members believed Palmer was best qualified. The other member believed Spaulding was best qualified. Madden determined that Spaulding was the best qualified applicant and recommended him to the College President.[10] Because there was at least one black person among the four finalists, the President signed the recommendation and Spaulding received a permanent appointment. Palmer was terminated on August 13, 1979.[11]

Because Palmer believed himself better qualified than Spaulding based on the fact that he had more work experience and because he felt the selection process was unfair, he filed a charge with the Equal Employment Opportunity Commission.[12] After receiving his right to sue letter on November 24, 1980, he filed the complaint in this action. Palmer's basic contention is that he was *terminated* solely because the Board wanted to replace him with a younger black employee who was less qualified than he. The Board's primary defense to all the claims is that it was acting pursuant to and in compliance with a valid affirmative action plan.

7. Only two of the applicants were black.

8. Palmer was selected with the strong backing of the music faculty.

9. Palmer's 1978 contract contained the following provision:
   5. It is expressly understood and agreed by and between the parties hereto that neither the Faculty Member nor the Board has any further contractual obligation to the other after May 11, 1979. The Faculty Member understands that unless and until he shall receive a continuing contract under and by virtue of the provisions of Section 6A–8, 88, State Board of Education Regulations, he shall have probationary status and no legal cause shall be required of the Board in the event that the Faculty Member is not re-employed by the Board after May 11, 1979.

10. Palmer argues that Spaulding was not required to personally audition as he was in 1978

and that this raises an inference of discrimination. Spaulding did provide the Committee and Madden with a video tape showing him conducting an orchestra at the University of Eastern Kentucky where he received his Master's Degree. The tape also included vocal renditions by Spaulding. There is no reasonable inference of discrimination which arises from this difference.

11. Spaulding's contract was not renewed for the subsequent year. The vocal music instructor position was abolished in 1982.

12. While Palmer has admitted that Spaulding was qualified for the position, there is a disputed issue of fact as to whether Palmer was better qualified. There is no evidence that Palmer did not adequately perform while he held the position.

## ADEA Claim

The trial court's sole finding and conclusion on this issue was as follows:

> Aside from evidence that the Plaintiff is between the ages of forty and seventy, that he was qualified to do the job for which he was not rehired, and that he was replaced by a younger person, the plaintiff concedes that he cannot produce any more evidence of age discrimination. Defendant, on the other hand, has articulated legitimate reasons other than age discrimination for its actions regarding the Plaintiff, not the least of which is the expiration of Plaintiff's contract term, which is uncontroverted by Plaintiff. Accordingly, summary judgment for Defendant on this issue is appropriate.

The expiration of Palmer's contract, standing alone, would not be a sufficient legitimate, non-discriminatory, reason for failing to renew his contract.[13] The Board, however, *articulated* another legitimate, non-discriminatory reason. The Board offered evidence which tended to show that it was acting pursuant to an affirmative action plan mandated by HEW and the federal courts.

In the trial court and in briefs filed in this court, Palmer has pointed to no direct evidence of age discrimination. He relies on the bare bones of a prima facie case.

■ The appropriate standard for determining whether summary judgment is proper is whether there is a genuine issue of material fact for trial, and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.Pro. 56. By necessity, a plaintiff must make out a prima facie case in order to avoid summary judgment. In the instant case, this means that the plaintiff must show that a genuine issue exists on whether the Board discriminated against the plaintiff because of his age. Establishing a prima facie case, however, does not always suffice for a plaintiff to survive a motion for summary judgment in an ADEA case. *Pace v. Southern Rail-*

*way System,* 701 F.2d 1383, 1391 (11th Cir.1983) *cert. denied* —— U.S. ——, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983); *Simmons v. McGuffey Nursing Home, Inc.,* 619 F.2d 369, 371 (5th Cir.1980).

■ This court in *Pace, supra,* stated:

> A plaintiff, when faced with a motion for summary judgment, cannot rely on attenuated possibilities that a jury would infer a discriminatory motive, but rather must come forward with sufficient evidence to establish a prima facie case and respond sufficiently to any rebuttal by the defendant to create a genuine issue of material fact. Even where a prima facie case has been established but the defendant has rebutted with a proffer of legitimate, nondiscriminatory reasons for the discharge, a genuine issue of material fact is not automatically presented.

701 F.2d at 1391. The only evidence offered by Palmer in opposition to the motion for summary judgment is that he is within the protected age group; that he is qualified for the position; that his contract was not renewed; and that the Board hired someone outside the protected age group. Palmer makes no argument that there is statistical proof of a pattern of age discrimination. He offers no other direct or circumstantial evidence of age discrimination. Palmer's own argument demonstrates that the Board's decision was based on its consideration of the affirmative action plan and possibly race, but not age. In his brief, Palmer states, "The undisputed facts before the court rendered inescapable the inference and ultimate conclusion that Palmer was terminated from his employment so that the College could hire a black employee." Indeed the ADEA claim appears to have been prompted solely because Palmer was in the protected age group and Spaulding was not. This court has rejected the argument that "as a matter of law a prima facie case is established if a plaintiff simply shows he is in the protected group, was adversely affected by

---

**13.** *See Whiting v. Jackson State University,* 616 F.2d 116, 123, n. 6 (5th Cir.1980), *rehearing* *denied,* 622 F.2d 1043 (1980); *Sparks v. Griffin,* 460 F.2d 433, 443 (5th Cir.1972).

..ı employment decision, was qualified and was replaced by one younger than himself." *Pace, supra*, 701 F.2d at 1390. "The possibility of a jury drawing a contrary inference sufficient to create a dispute as to a material fact does not reify to the point even of a thin vapor capable of being seen or realized by a reasonable jury." *Pace, supra*, 701 F.2d at 1391, citing *Simmons v. McGuffey Nursing Home, Inc.*, 619 F.2d 369, 371 (5th Cir.1980). The trial court did not err in granting the Board's motion for directed verdict directed to the ADEA claim.

### Title VII Claim

■ Palmer argues that the trial court erred in granting the Board's motion for summary judgment and denying his motion for summary judgment on this issue. He argues that he was the victim of "reverse discrimination."

Palmer has stipulated that the College was required by law to implement an affirmative action program designed to remedy the effects of past discrimination. Further, he states in his brief filed in this court that "It is undisputed that the plan in and of itself is valid."[14] There having been a finding of past discrimination and the adoption of a valid affirmative action plan as a remedial measure, there is no question that affirmative action in the form of hiring quotas or ratios is appropriate in order to rectify the past discriminatory hiring practices.

"At this point in the history of the fight against discrimination, it cannot be seriously argued that there is any insurmountable barrier to the use of goals or quotas to eradicate the effects of past discrimination." *United States v. City of Miami, Fla.*, 614 F.2d 1322 (5th Cir.1980), *modified* 664 F.2d 435 (5th Cir.1981).[15] "Without race and sex consciousness, the effects of past racial and sexual discrimination cannot be eradicated. Many cases have held racial and sexual goals to be appropriate." *United States v. City of Alexandria*, 614 F.2d 1358, 1365 (5th Cir.1980).[16]

There being no question here that Florida's system of higher education, of which the College is a part, had been found guilty of past discrimination, and that its Plan was valid, the only remaining question is whether Palmer was "discharged" and whether the Board unnecessarily and invidiously trammeled upon his interests. *See Weber, supra.*

Palmer's primary argument is that the Board discriminated against him by not giving him a permanent appointment in

---

**14.** Palmer having acknowledged that the Plan is valid, it is not necessary for the court to subject it to the scrutiny of the type outlined in *Valentine v. Smith*, 654 F.2d 503, 510 (8th Cir.1981), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). There seems to be no real dispute that the plan was "substantially related to the object of remedying prior discrimination." *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). In *Valentine, supra*, the following tests for determining if an affirmative action plan is substantially related to the objective of remedying past discrimination and thus constitutionally permissible, was set out:

(1) its implementation results or is designed to result in the hiring of a sufficient number of minority applicants so that the racial balance of the employer's work force approximates roughly, but does not unreasonably exceed, the balance that would have been achieved absent the past discrimination; (2) the plan endures only so long as is reasonably

necessary to achieve its legitimate goals; (3) the plan does not result in hiring unqualified applicants; and (4) the plan does not completely bar whites from all vacancies or otherwise unnecessarily or individiously trammel their interests.

654 F.2d at 510.

**15.** See cases cited at 614 F.2d 1335–1336. See also discussion at 1336–1338 distinguishing *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) and finding some support in *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), case involving private parties.

**16.** An affirmative action plan is perforce designed to result in different treatment between whites and blacks until the effect of past discrimination has been eradicated. The very purpose of the plan is to hire qualified blacks until the plan's goals have been accomplished, even if innocent whites may be affected in the process.

1978.[17] This argument ignores the admitted fact that such a policy was pursuant to the affirmative action plan and that the person hired was to be given only a temporary appointment if there was not a qualified black among the four recommended and qualified applicants. Although the temporary appointee was not excluded from consideration when the search and recruitment process was reinstituted the next year, he was then subject to the provisions of the affirmative action plan. Palmer's argument that his designation as a temporary employee was a "sham" is not supported by his own admission that the temporary appointment was made under a policy pursuant to the Plan.[18] Even if a temporary appointment were not authorized by the Plan, it was accepted by Palmer without objection. Furthermore, the action was a reasonable means of seeking to remedy past discrimination.

We hold that the circumstances of Palmer's hire under a temporary appointment pursuant to an affirmative action plan did not result in a "discharge" nor a trammelling of his interests as contemplated by *Weber, supra*, 443 U.S. at 208, 99 S.Ct. at 2730. Palmer was not discharged in the usual sense. He was not ultimately permanently hired under a continuing affirmative action selection process which was made known to him in 1978. Neither *Whiting, supra*, nor *Sparks, supra*, were cases involving affirmative action plans. They are not apposite with regard to Palmer's right to be considered for rehire here.

The trial court correctly determined that the *temporary* appointment of Palmer in 1978 was a "direct consequence" of the plan. "Once an employer has produced evidence that its treatment of the plaintiff was a direct consequence of its implementation of a bona fide affirmative action plan, the employer is entitled to a judgment as a matter of law unless the plaintiff shows that the purpose of the employer's affirmative action plan is not remedial. To raise a genuine issue of material fact, and avoid summary judgment, a plaintiff in a reverse discrimination case must present evidence that would show that (1) some reason other than a remedial reason motivated the employer when implementing the plan or (2) the plan adopted unreasonably exceeds its remedial purpose." *Setser v. Novack Investment Co.*, 657 F.2d 962, 969–70 (8th Cir.1981); *cert. denied*, 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981). "Like the defendants in *United Steelworkers of America v. Weber*, 443 U.S. 193 [99 S.Ct. 2721, 61 L.Ed.2d 480], . . . the defendants here were on a 'high tightrope without a net beneath them.' . . . Like the defendants there, the defendants here face liability for past discrimination against blacks, yet cannot attempt to rectify past wrongs without fearing liability to whites." *City of Alexandria, supra*, 614 F.2d at 1366.

We conclude that the trial court did not err in granting the defendant's motion for summary judgment addressed to plaintiff's Title VII claim.

AFFIRMED.

---

**17.** There is no evidence that Palmer filed an EEOC charge within 180 days after he was given only a temporary appointment. Palmer has argued that the "kernel" of the entire controversy, was the Board's failure to give him a permanent appointment in 1978. He further argues, however, that this failure was not sufficient to trigger an EEOC charge of discrimination in 1978. We disagree. His being given a "temporary appointment," coupled with his being notified that he would have to be reconsidered under the same selection process in 1979, was an adverse employment decision.

**18.** See "Facts That Are Admitted," No. 23.