William Russell SMITH, Plaintiff,

v.

Alan HARVEY, et al., Defendants.

No. 84–212–Civ–T–13.

United States District Court, M.D. Florida, Tampa Division.

Oct. 3, 1986.

Peter Dubbeld, Robert Johnson, St. Petersburg, Fla., Richard Frank, Tampa, Fla., for plaintiff.

City of St. Petersburg Legal Dept., St. Petersburg, Fla., for defendants.

## MEMORANDUM DECISION

GEORGE C. CARR, District Judge.

This cause comes before the Court upon cross motions for summary judgment. This action, although formerly consolidated with case number 84–342–Civ–T–13, was severed after oral arguments were heard on summary judgment motions in both cases. Accordingly, this judgment shall analyze only those issues raised in case number 84–212–Civ–T–13. A separate Order shall be entered in case number 84–342–Civ–T–13.

The plaintiffs in this action are all white males who were employed as fire fighters for the City of St. Petersburg ("City") at the time this action was filed. They allege that they were unfairly denied fire department promotions under the City's one-for one promotion policy that is a part of the City's voluntarily adopted affirmative action plan. Specifically, the plaintiffs allege that the one-for-one promotion policy, as clarified by former City Manager Alan Harvey in a policy clarification letter dated March 8, 1984 ("Policy Letter"; exhibit "B" attached to plaintiff's motion), is invalid and therefore the City's affirmative action plan ("Plan") violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. §§ 1981 and 1983, and equal protection under the Fourteenth Amendment to the United States Constitution.

The City has had a voluntary affirmative action plan since at least 1974. *Drayton v. City of St. Petersburg,* 477 F.Supp. 846, 850 (M.D.Fla.1979). The current version was adopted in 1980 and requires the hiring of a certain percentage of minorities and females into the City's work force. The one-for-one promotion policy was approved by the City counsel in 1983, and clarified by former City Manager Alan Harvey in his

1984 Policy Letter. Four minority males and 16 white males have been promoted within City fire department ranks since the one-for-one policy took effect.

Under the City's current plan and policy, City jobs were broken down into 78 different job groups. Minority and female hiring and promotion goals were established for each group by reference to estimated availability rates for minorities and females within each job group. The promotions challenged in this action involve promotion of black males into the City job groups of fire department lieutenants, captains and deputy chiefs. The estimated availability rate for each of those groups was set at the rate of minority employment in the immediate subordinate rank because promotions within the fire department are only made from those lower ranks.

In addition to the individual goals set for the different job groups, city-wide departmental Equal Employment Opportunity ("EEO") category goals were established. Under the plan and policy, each of the 78 City job groups were pigeonholed into one of eight EEO categories. Fire department lieutenants, captains and deputy chiefs were all categorized under the EEO "professional" category. EEO goals were established for each category by determining the weighted average of the goals established for each City job group occuring within that category (availability rate times the number of incumbents divided by the total number of incumbents within the particular EEO category). The EEO professional category goal for minority males was 10.9% when this action was filed.

The City's plan or promotion policy is not triggered unless all four of the following criteria are met: (1) there is a showing of minority or female underutilization in *both* the specific City job group and the EEO category by reference to established goals and actual percentages. (*See* discussion p. 1112 *infra*); (2) the last promotion in the underutilized job classification was given to a white male; (3) there is a qualified minority or female to fill the position; and (4) there are no exceptions that would justify deviating from the one-for-one policy.

The plaintiffs argue: (a) the City, as a public employer, may not voluntarily adopt an affirmative action plan; (b) the plan is invalid because there has been no judicial, legislative or administrative findings of discrimination in promotion; (c) the one-for-one promotion policy unnecessarily trammels on the interests of white male fighters; and (d) the plan is invalid because the one-for-one policy seeks to maintain racial quotas once achieved.

The defendants dispute all of the plaintiff's contentions. The defendants assert that under current case law a public employer may voluntarily implement an affirmative action plan. They claim that there has been an administrative finding of discrimination in hiring and past societal discrimination show that the applicable labor pool is so tainted with discrimination that it amounts to discrimination in promotion. The defendants counter the plaintiffs' contention that the plan unnecessarily trammels the interests of non-minorities by explaining that the plan's limited interference with the rights of advancement is not sufficient to amount to an unnecessary trammeling. They further argue that no maintenance of racial quotas has gone into effect and therefore the plaintiffs' fourth contention is not ripe. The defendants point out that the new City Manager has signed an affidavit providing that the plan will cease to operate on those job categories that reach the desired goals.

Initially, it should be noted that "At this point in the history of the fight against discrimination, it cannot be seriously argued that there is any insurmountable barrier to the use of goals or quotas to eradicate the effects of past discrimination." *United States v. City of Miami*, 614 F.2d 1322, 1335 (5th Cir.1980), *modified* 664 F.2d 435 (5th Cir.1981); *accord, Palmer v. District Board of Trustees of St. Petersburg Junior College*, 748 F.2d 595, 600 (11th Cir.1984) (upheld statewide community college affirmative action plan). "Without race and sex conciousness, the effects

of past racial and sexual discrimination cannot be eradicated. Many cases have held racial and sexual goals to be appropriate." *United States v. City of Alexandria,* 614 F.2d 1358, 1365 (5th Cir.1980). Affirmative action plans, however, must be able to meet certain criteria before they can withstand a statutory or constitutional challenge.

The Supreme Court in *United States Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), announced several factors that it considered important in determining whether an affirmative action plan voluntarily adopted by a private employer was valid under Title VII. They include: (1) the purposes of the plan mirror those of Title VII; (2) "the plan does not unnecessarily trammel the interests of white employees"; and (3) the plan is a temporary measure that is not intended to maintain racial balances but "simply to eliminate a manifest racial imbalance." *Id.* at 208, 99 S.Ct. at 2730. Although *Weber, supra,* involved a private employer as opposed to a public employer as in the case at bar, the Supreme Court cited *Weber* with approval in two recent decisions involving voluntary affirmative action plans adopted by public employers. *See Local Number 93 v. City of Cleveland,* —— U.S. ——, 106 S.Ct. 3063, 3072, 92 L.Ed.2d 405 (1986); *Wygant v. Jackson Board of Education,* —— U.S. ——, 106 S.Ct. 1842, 1851 n. 9, 90 L.Ed.2d 260 (1986). Notably, in *Local Number 93, supra,* the Supreme Court observed that "there may be instances in which a public employer, consistent with both the Fourteenth Amendment as interpreted in *Wygant,* [*supra,*] and § 703 [of Title VII] as interpreted in *Weber,* could voluntarily agree to take race-conscious measures in pursuance of a legitimate remedial purpose." 106 S.Ct. at 3073 n. 8. This Court will therefore utilize the *Weber* rational in determining the validity of the challenged plan and policy under Title VII and subject the plan and policy to a constitutional analysis consistent with the Supreme Court's decision in *Wygant.*

Although the Supreme Court has required that affirmative action plans challenged on equal protection grounds pass strict scrutiny by showing that a plan is justified by a compelling governmental interest and that the means chosen are narrowly tailored, *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 908 (1980), it has not agreed on specific inquiries that a court should make in determining the validity of such plans. *See e.g., Wygant v. Jackson Board of Education, supra,* (only three Justices joined all parts of the opinion in which the judgment of the Court was entered). "Hence, 'determining what [equal protection reverse discrimination] "test" will eventually emerge from the Court is highly speculative.'" *Paradise v. Prescott,* 767 F.2d 1514, 1530 (11th Cir.1985) (upheld affirmative action consent decree challenged on both Title VII and Constitutional grounds). *See also Bratton v. City of Detroit,* 704 F.2d 878, 885 (6th Cir.) ("The Supreme Court has not provided the kind of guidance in the constitutional context that [it has] under Title VII"), *modified,* 712 F.2d 222 (6th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).

Despite the lack of guidance from the Supreme Court, the Eleventh Circuit, in *Paradise v. Prescott,* 767 F.2d at 1531, summarized three tests utilized in the past in determining the constitutionality of affirmative action. The three tests are summarized below:

Test 1:

> [G]oals and targets are acceptable under the constitution ... so long as they are reasonably related to the legitimate state goal of achieving equality of employment opportunity.... In fleshing out the "reasonableness" requirement ... three factors should be taken into account: (1) whether the remedial relief is temporary "and will terminate when manifest [racial] imbalances have been eliminated; " (2) whether the relief establishes "an absolute bar to the advancement of white[s];" and (3) whether the relief will benefit only "qualified" persons.

*Id., citing United States v. City of Alexandria,* 614 F.2d 1358, 1363–66 (5th Cir.1980) (held that district Court erred in not approving affirmative action consent decree).

Test 2:

> [L]egislation employing benign racial classifications generally will be upheld if: (1) the governmental authority has authority to pass such legislation; (2) adequate findings have been made that the legislation is remedying the present effects of past discrimination; and (3) the use of the classifications extends no further than the demonstrated need of remedying the present effects of past discrimination.

*Paradise,* 767 F.2d 1514 at 1531, *citing South Florida Chapter of the Associated General Contractors v. Metropolitan Dade County,* 723 F.2d 846, 850 (11th Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984) (upheld county ordinance granting preferential treatment to blacks in contract bidding).

Test 3:

> [A]fter a competent body has made findings of past discrimination, the constitutional inquiry is "whether the affirmative action plan is 'substantially related' to the objective of remedying prior discrimination."
>
> "A race-conscious affirmative action program is substantially related to remedying past discrimination if (1) its implementation results or is designed to result in the hiring of a sufficient number of applicants so that the racial balance of the employer's work force approximates roughly, but does not unreasonably exceed, the balance that would have been achieved absent past discrimination; (2) the plan endures only so long as is reasonably necessary to achieve its legitimate goals; (3) the plan does not result in hiring unqualified applicants; and (4) the plan does not completely bar whites from all vacancies or otherwise unnecessarily or invidiously trammel their interests."

767 F.2d at 1532–1533, *citing Valentine v. Smith,* 654 F.2d 503 (8th Cir.) *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981).

■ The *Valentine* requirement in test 3, above, that an affirmative action plan must be "substantially related" to the stated objective, is more in keeping with the Supreme Court's strict scrutiny standard than the other two tests above. Strict scrutiny requires that "any racial classification 'must be justified by a compelling governmental interest.'" *Wygant v. Jackson Board of Education,* — U.S. —, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986). Remedying the effects of past discrimination has been recognized as a compelling interest. *Id.* 106 S.Ct. at 1850 ("In order to remedy the effects of prior discrimination, it may be necessary to take race into account"); *accord, Fullilove,* 448 U.S. at 516, 100 S.Ct. at 2794 (Powell, J. writing separately) (redressing identified discrimination is a "compelling governmental interest.") Strict scrutiny also requires that affirmative action plans be "narrowly tailored" to the achievement of that compelling interest. *Wygant,* 106 S.Ct. at 1850. "Narrowly tailored" has been interpreted to require that no less restrictive means could have been used to accomplish the desired goals. *Id.* at n. 6. In other words, in order to pass the strict scrutiny of a reviewing court, the means employed by a challenged affirmative action plan must be substantially related to the achievement of the compelling governmental interest of eliminating the effects of past discrimination that could not otherwise be eliminated by less restrictive means.

■ The strict scrutiny standard, together with the overlapping considerations of the three tests summarized in *Paradise v. Prescott, supra,* and the specific challenges and defenses to the affirmative action plan challenged in the case at bar, can be combined to develop a hybrid test. The following six part test, as developed from common and necessary considerations from the tests utilized in the past, shall be applied to determine the constitutionality of the City's affirmative action plan and promotion policy:

1. Did authority or governmental body that implemented the plan have the authority to do so?

2. Has there been a competent finding of past discrimination that presently affects the targeted work force?

3. Does the plan roughly approximate, but not unreasonably exceed, the minority balance that would have been achieved in the applicable work force absent past discrimination?

4. Does the plan operate to hire or promote only qualified applicants?

5. Does the plan unnecessarily trammel the interests of white males and is it otherwise narrowly tailored?

6. Is the plan temporary and will it terminate once the targeted imbalances have been eliminated?

■ With the additional inquiry of whether the purposes of the City's affirmative action plan mirror those of Title VII, the six factors in the above constitutional test address all those concerns expressed in *United Steelworkers of v. Weber, supra,* under Title VII. The stated purpose of the City's plan is "to provide the guidelines to achieve equal employment opportunity for all persons regardless of race, color, religion, sex, national origin, age or physical handicap, except where age and physical condition constitute a bona fide occupational qualification." (plan at 2). Such a purpose unquestionably mirrors the purposes of Title VII.[1] *See e.g., International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 348, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396 (1977) (purpose of Title VII is " 'to assure equality of employment opportunities and to eliminate ... discriminatory practices' "). The City's promotion policy, as an integral part of the City's plan, similarly mirrors Title VII. Accordingly, the six part test outlined above shall be utilized to test the validity of the City's plan and policy under Title VII as well as under the statutory and constitutional equal protection challenges.

The first inquiry under the test is whether the City had the authority to implement its affirmative action plan and policy. The plaintiff's argue that the Supreme Court's refusal in *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 583, 104 S.Ct. 2576, 2590, 81 L.Ed.2d 483 (1984), to pass upon the issue of whether, under Title VII, a public employer could have legally adopted an affirmative action program of the type challenged in that action suggests that the City was without authority to implement the challenged plan. Indeed, language in *Regents of the University of California v. Bakke,* 438 U.S. 265, 308, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978), as well as in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), supports the plaintiffs' contention by providing that "isolated segments of our vast governmental structures are not competent to make [affirmative action] decisions, at least in the absence of legislative mandates and legislatively determined criteria", 438 U.S. at 309, 98 S.Ct. at 2758, and that Congress has a unique and unparalleled role in enforcing equal protection guarantees. 448 U.S. at 483–484, 100 S.Ct. at 2777–78.

The Eleventh Circuit, in *South Florida Chapter of the Associated General Contractors v. Metropolitan Dade County,* 723 F.2d 846 (11th Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 85 L.Ed.2d 150 (1984), in an action that questioned the validity of a county ordinance, addressed the issue of whether local governments are competent to voluntarily adopt an affirmative action plan by explaining:

we must first determine whether Metropolitan Dade County was a competent legislative body to adopt remedial measures designed to eliminate past discrimination. In *Fullilove,* both Chief Justice Burger and Justice Powell emphasized the "unique" role accorded Congress in dealing with past discrimination. 448 U.S. 483, 500, 100 S.Ct. at 2777, 2786. We agree with the Sixth Circuit, how-

---

1. The plan's stated purpose is also consistent with *Fla.Stat.* § 112.042(1) (1983) (prohibits discrimination in county or municiple employment).

ever, that references in *Fullilove* to Congress' power were not intended to imply that governmental bodies other than Congress may not act to remedy past discrimination, but were only emphasizing the "unequaled" power of Congress to act under its specific powers granted by the Fourteenth Amendment. *Ohio Contractors [v. Keip ]*, 713 F.2d [167] at 172 [6th Cir.1983]. Thus, although the scope of Congress' power to remedy past discrimination may be greater than that of the states, state legislative bodies are not without authority to ensure equal protection to persons within their jurisdiction.

723 F.2d at 852.

■ The plaintiffs do not attack the City's authority under state law to impliment the plan or promotion policy. In fact, a review of Florida's Municipal Home Rule Powers Act reveals that the City, with limited exceptions, "has the powers to enact legislation concerning any subject matter upon which the state legislature may act...." *Fla.Stat.* § 166.021 (1983); *see also Fla.Stat.* § 166.042 (legislative intent); Fla. Const. art. 8, § 2 (municipalities have all governmental, corporate and proprietary powers except as otherwise provided by law). A review of the City's affirmative action plan reveals that its enactment represents an attempt to comply with the mandates of higher legislative authorities. Page one of the plan provides:

> This plan covers the City of St. Petersburg's policy in all City departments, and is written to be in conformance with Title VII of the Civil Rights Act of 1964, as amended 1972, Executive Order 11246, the Rehabilitation Act of 1973, the Florida Human Relations Act of 1976, and St. Petersburg, Florida, City Code Chapter 12½ and all other relevant Federal Civil Rights Laws and funding agency guidelines.

The plan and one-for-one policy were approved by the City counsel and former City Manager Alan Harvey's Policy Clarification letter was promulgated according to the plan's express provision for internal dis-

semination of City policy. (plan at 7). In addition, there is ample authority within this circuit approving local governmental voluntary measures designed to eliminate the effects of past discrimination. *See e.g., South Florida Chapter of the Associated General Contractors v. Metropolitan Dade County, supra* (county ordinance); *United States v. City of Miami,* 614 F.2d 1322 (5th Cir.1980) (consent decree). This Court therefore concludes that the City had the authority to enact the affirmative action plan and promotion policy challenged in this action.

Having found that the City had the authority to enact the policy and plan, it must now be determined whether there has been a competent finding of past discrimination that presently affects the current work force. In the past, the Supreme Court has required that there be a judicial, legislative or administrative finding of constitutional or statutory violations against minorities before upholding challenged affirmative action plans. *See, Bakke,* 438 U.S. at 307–308, 98 S.Ct. at 2757. The plaintiffs argue that the City relied upon statistics alone to support its plan and promotion policy and that such evidence is insufficient. The defendants argue that statistical evidence alone is sufficient and that in any event there have been other competent findings of discrimination that support the City's plan and policy.

In *United Steelworkers of America v. Weber, supra,* the Supreme Court upheld a private employer's affirmative action plan that was not supported by prior judicial findings of discrimination but rather by workforce statistics alone. The Sixth Circuit, in *Detroit Police Officers' Association v. Young,* 608 F.2d 671 (6th Cir.1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), extended that particular holding in *Weber* to public employers by finding that an internal statistical determination by Detroit's police department that blacks were underrepresented was sufficient to support Detroit Police Department's affirmative action plan. *Id.* at 689–90. The Supreme Court has not rejected

the use of statistics to prove prior discrimination. Recently, the Supreme Court held that "societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy." *Wygant v. Jackson Board of Education,* 106 S.Ct. at 1848. In that same decision, the Court suggested that a proper showing of a statistical disparity between those employed by a public employer and the relevant labor market is the very type of evidence necessary for determining the existence of actual discrimination needed to support a public employer's voluntarily adopted affirmative action plan. *Id.*

■ Whether the statistical evidence in the case at bar is alone sufficient to support the City's voluntary affirmative action plan is an issue that need not be decided because there have been other adequate findings of past discrimination that, when taken together with statistical imbalances, support the City's affirmative action plan. *See e.g., Drayton v. City of St. Petersburg,* No. 65–148–T (M.D.Fla.1965) (segregation policies of St. Petersburg Police Department violate civil rights); *City of St. Petersburg v. Alsup,* 238 F.2d 830 (5th·Cir. 1956) (City enjoined from segregating municipal beach and swimming pool); administrative finding by Human Relations Director for City concurring with findings of Manager of Human Relations Field Operations that City of St. Petersburg's police department unlawfully discriminated in promotional practices. (Exhibit "5" of defendant's motion for summary judgment).

The plaintiffs argue that the above findings are irrelevant because they only relate to past discrimination and do not show discrimination in promotion among the ranks presently employed in the fire department. Indeed, the court in *Drayton v. City of St. Petersburg,* 477 F.Supp. at 861 n. 3, found:

To the extent that the Plaintiffs continue to press for relief concerning the promotion of black Firefighters to officer or supervisory levels, such relief is denied because (1) there is no evidence of contemporary discrimination in that regard, and (2) the Plaintiffs do not represent,

and have not been certified as representatives of, existing employees. For the same reason, however, the denial of that relief here (even though it is sought by these Plaintiffs) is without prejudice to any future claim that might be made in behalf of existing black employees.

It should be noted, however, that the plaintiffs in *Drayton* were minorities seeking affirmative relief from the Court as opposed to non-minorities attacking the validity of an affirmative action plan voluntarily adopted by an employer. As noted in *Detroit Police Officers Association v. Young,* 608 F.2d at 689: "Discriminatory acts which might not give rise to legal liability may nonetheless be sufficient to justify a voluntary remedial affirmative action plan."

The plaintiffs also contend that the Supreme Court's ruling in *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), that there must be an actual showing of discrimination against the very minorities seeking relief, is applicable to the case at bar. The Eleventh Circuit, however, has distinguished *Stotts* by observing:

as the Supreme Court itself was careful to note, the central issue in [Stotts] concerned the district court's authority to override a bona fide seniority system to require layoffs of more senior whites, in the absence of a showing of intentional discrimination. Here, the order under review involves promotions, not layoffs pursuant to a bona fide seniority system.

*Paradise v. Prescott,* 767 F.2d at 1528.

The Eleventh Circuit has consistently upheld affirmative action consent decrees under Title VII without requiring that relief be limited to actual victims of discrimination. *See e.g., Turner v. Orr,* 759 F.2d 817 (11th Cir.1985); *United States v. City of Alexandria, supra; Morrow v. Crisler,* 491 F.2d 1053 (5th Cir. en banc), *cert. denied,* 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). "Further, the use of quotas or goals under Title VII without regard to specific victims as one means to remedy past discrimination has been upheld regu-

larly throughout the federal courts of appeals." *Williams v. City of New Orleans,* 729 F.2d 1554, 1557 (5th Cir.1984) (see authorities cited therein).

The Eleventh Circuit has also recognized, in the context of a constitutional challenge to affirmative relief in a consent decree by a public employer, that there is no need to show actual discrimination in promotion as long as there has been a prior showing of entry level discrimination. *Paradise,* 767 F.2d at 1533 n. 16. *See also United States v. Georgia Power Co.,* 474 F.2d 906 (5th Cir.1973) (prior discrimination perpetuates promotional discrimination). The Eleventh Circuit's rational is wholly consistent with the holding in *Weber* and the recent decision in *Local Number 93 v. City of Cleveland,* — U.S. ——, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), wherein the Supreme Court reaffirmed *Weber* in the context of a public employer's consent decree by stating: "It is equally clear that the voluntary action available to employers and unions seeking to eradicate race discrimination may include reasonable race-conscious relief that benefits individuals who were not actual victims of discrimination." *Id.* at 106 S.Ct. at 3072. Therefore, the City's plan and promotional policy passes step two of this Court's six part test.

The third inquiry is whether the City's hiring and promotion goals roughly approximate, and do not unreasonably exceed, the racial balance that would have been achieved in the applicable labor force absent past discrimination. The plaintiffs argue that the City's promotion goals are unreasonable by pointing to the fact that the City's goal of 19.6% for minority fire lieutenants (17.9% as of April 1985) approximately doubles the relevant labor market for blacks established in *Drayton v. City of St. Petersburg,* 477 F.Supp. at 850 (found relevant labor market in 1979 was 9.6% for blacks and 8.3% for black males). The plaintiffs' argument fails to recognize, however, that the City's plan requires a showing of underutilization in both the City job group *and* the EEO category before the promotion policy will be applied. *See* discussion p. 1106 *supra.*

Underutilization is defined as having fewer minorities or women in a particular job group or category than would reasonably be expected by their availability. 41 C.F.R. § 60–2.11. Minority underutilization in fire department upper ranks was found by the City by comparing employment profiles with estimated availability rates for each fire department job group as well as for the EEO professional category in accordance with 41 C.F.R. § 60–2.11, before the City's promotion policy was applied to job group promotions. For example, in April 1985, the job group goal for minority male fire department lieutenants was 17.9% (representing the percentage of minority males in the immediate subordinate rank), whereas the actual percentage of minority male utilization as fire lieutenants was 11.1%, thus constituting underutilization. During the same time period, the EEO professional category goal was 10.9%, but the actual percentage of minority male utilization as professionals within the department was 10.2%. Therefore, the City's promotion policy was triggered.

■■■ This Court finds that the City's use of the immediate subordinate ranks as the applicable labor pools in establishing job group goals for firefighter promotions was reasonable, proper and most indicative of the relevant labor market. This Court further finds that the minority male promotion goals for City fire lieutenants, although nearly double that of the relevant labor market for black males found in *Drayton v. City of St. Petersburg, supra,* were adequately tied to the EEO professional category goal which "approximates roughly, but does not unreasonably exceed the [racial] balance that would have been achieved [in the applicable labor force] absent past discrimination." *Valentine,* 654 F.2d at 510; *see also NAACP v. Allen,* 493 F.2d 614 (5th Cir.1974) (approving mandate requiring 50% hiring as a temporary measure to meet lower goal of 25% minority utilization). The above conclusion applies to the challenges involving promotions in

the job groups of fire department captains and deputy chiefs as well.

■ The fourth inquiry is whether the plan operates to hire or promote only qualified applicants. The plaintiffs do not argue that the minorities promoted under the City's policy were not qualified, but rather claim that the plaintiffs are more qualified. The promotion policy, on its face, requires that there be a qualified minority or female for a given position before affirmative promotion is triggered. (Policy Letter at 2). Accordingly, the City's plan and promotion policy passes step four of the six part test.

Step five of the test requires that the challenged affirmative action plan be narrowly tailored and not unnecessarily trammel the interests of white males. On this subject, the Supreme Court has noted: "When effectuating a limited, properly tailored remedy to cure the effects of prior discrimination, ... a 'sharing of the burden' by innocent parties is not impermissible." *Fullilove v. Klutznick,* 448 U.S. at 484, 100 S.Ct. at 2778 (quoting *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976)). Although the Supreme Court has invalidated affirmative relief that required white layoffs in favor of the retention of less senior minorities, see *Wygant v. Jackson Board of Education, supra,* and *Firefighters Local Union No. 1784 v. Stotts, supra,* it has distinguished such plans by noting: "Denial of a future employment opportunity is not as intrusive as loss of an existing job." *Wygant,* 106 S.Ct. 1851 (constitutional challenge). In fact, the Supreme Court has found that an affirmative action plan that "does not require the discharge of white workers and their replacement with new black hirees ... [n]or ... create an absolute bar to the advancement of white em-

ployees ...", "does not unnecessarily trammel the interests of white employees [if] the plan is a temporary measure [and] is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance." *United Steelworkers of America v. Weber,* 443 U.S. at 208, 99 S.Ct. at 2730 (challenge under Title VII).

■ It is clear that the City's plan and promotion policy does not require the discharge of white males or create an absolute bar to the advancement of whites. In fact, it appears that the four criteria that must be met before the plan is triggered, see discussion on page 1106, *supra,* sufficiently tailor the the plan so that it passes strict scrutiny. The plaintiffs do not suggest, nor does this Court find, a less restrictive means of accomplishing the City's legitimate goal for minority promotions within fire department ranks.[2] This Court therefore finds that the City's plan and promotion policy are narrowly tailored and do not unnecessarily trammel the interests of the white males challenging the plan, thus passing both constitutional and statutory scrutiny, as long as the City's plan and policy can pass the sixth and final inquiry of this Court's test: Is the plan temporary and will it terminate once the targeted imbalances have been eliminated?

■ It is clear that affirmative action plans that seek to maintain quotas once racial balances are met are invalid. *See e.g., United Steelworkers of America v. Weber, supra; Paradise v. Prescott, supra* (and authorities cited therein). The City's September 1980 Affirmative Action Plan does not suggest that quotas should be maintained and the plaintiffs do not contest the validity of that version of the plan. The plaintiffs do object, however, to former

---

2. The plaintiffs cite *Hammon v. Barry,* 606 F.Supp. 1082 (D.C.1985) for the proposition that the promotional aspects of the plan unnecessarily trammel their interests. That decision, however, is based upon the *Hammon* court's requirement that there be a specific showing of discrimination in promotion. This Court as well as the Supreme Court has rejected such a requirement. *See* discussion at pp. 1111–1112,

*supra.* In addition, the City has presented statistical evidence of discrimination in promotion that would support the City's promotion policy even under the stricter *Hammon* standard. *See Hammon,* 606 F.Supp. at 1097 (showing of discrimination in area the remedy is designed to effect can be based on either statistical evidence or an official finding).

City Manager Alan Harvey's March 8, 1984, Policy Letter which provides:

> Once a department reaches its goal throughout its workforce, (minority males, white females, minority females) the policy ceases to affect that department. If at a later date that department should fall below its goals, the policy would automatically go into effect. An on-going monitoring of each job group and EEO category will continue on a quarterly basis to see that we achieve and maintain our goals.

(Policy Letter at 3). The plaintiffs argue that the above language unequivocally represents an intention to maintain racial quotas and therefore the City's plan and policy are invalid. The above language does indeed appear to support the plaintiffs' contention. The issue is complicated, however, by Policy Letter language in the paragraph immediately preceding the above-quoted passage. It provides:

> The Affirmative Action Policy of 1980, which has been clarified here, will not continue beyond a reasonable time required to eliminate the conspicuous imbalance in certain job classes and Departments. The affirmative hiring/promotion policy is a temporary measure meant to correct the underutilization of minorities and women in the City's workforce. There has never been any intention that the City's Affirmative Action Policy of 1980 would exceed or go beyond remedial objectives. The policy will not affect job groups or departments which have already reached the established goals. If a department has reached its goals for minority males but has not reached the goals for white females and minority females, the policy will only apply for females, i.e., one white female or minority female for every white male hired/promoted.

 Whether the conflicting language of the Policy Letter quoted above amounts to quota maintenance sufficient to invalidate the City's plan and promotion policy is an issue that this Court need not decide. The City fire department had not yet met its promotion goals at the time the plaintiffs filed this suit. Therefore, at the time this action was commenced there was no quota maintenance through which the plaintiffs could claim injury. Since it has been shown that other aspects of the plan pass both statutory and constitutional scrutiny, the mere speculation that the plan would be illegally maintained did not present an issue ripe for determination at the time this action was filed. In the words of the Supreme Court: "Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of judicial function." *International Longshoreman's and Warehousemen's Union, Local 37 v. Boyd*, 347 U.S. 222, 224, 74 S.Ct. 447, 448, 98 L.Ed. 650 (1954).

After this action was filed, but before the last minority male was promoted in City fire department ranks, the new City Manager, Robert Obering, filed an affidavit stating that with the promotion of one more minority male in the fire department "the one-for-one policy will permanently terminate with respect to minority males in the Fire Department for the positions of Fire Lieutenant, Fire Captain and Deputy Chief and will not affect any future employment vacancies." (October 24, 1985 affidavit at 2). Although the City has since met its minority male promotion goals for those ranks within the fire department, the new City Manager's affidavit mooted the plaintiffs' claim of quota maintenance before the issue became ripe. Since the question of whether the City at one time sought to maintain racial quotas cannot affect the rights of the parties in the case at bar, this Court is without the power to decide the issue. *See e.g., Defunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974).[3] It is clear, however, that the City

---

3. Even if this Court addressed the issue of whether the Policy Letter sought to maintain racial quotas under the plan and policy, there is authority supporting the conclusion that mere

does not now seek to maintain racial quotas within fire department ranks. The plan and policy, as it affects the rights of the plaintiffs in this action, therefore passes the sixth and final inquiry of this Court's test and has therefore withstood the plaintiffs' statutory and constitutional challenges.

In conclusion, this Court finds that the City of St. Petersburg's affirmative action plan and one-for-one promotion policy challenged in this action mirror the purposes of Title VII, were implemented by an authorized governmental authority after a competent finding of past discrimination that presently affected the targeted work force, contain goals that do not unreasonably exceed the minority balance that would have been achieved absent past discrimination, operate to benefit only qualified applicants, are narrowly tailored and do not unnecessarily trammel the interests of white males. This Court further concludes that the challenged plan and policy, as originally written and clarified in the Policy Letter, are constitutional and valid under the statutory challenges in all respects except for the issue of quota maintenance on which this Court expresses no view. As it is clear that the City does not presently seek to maintain racial quotas within fire department ranks, the City's plan and policy, as it affects the litigants in the present action, is valid.

The clerk is directed to enter summary judgment in favor of the defendants on all counts of the complaint.

---

speculation that an affirmative action plan would be maintained is not grounds for invalidating the plan if there are adequate plan review mechanisms. *South Florida Chapter of the Associated General Contractors of America, Inc. v. Metropolitan Dade County,* 723 F.2d at 854.

The challenged plan requires periodic review and the City counsel has been kept apprised of the status of the one-for-one policy since it was approved in 1983. (plan at 37; City Manager Obering's October 24, 1985, affidavit).